## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

WACKO'S TOO, INC., et al.,

      Plaintiffs,

v.                                                                    Case No. 3:20-cv-303-TJC-MCR

CITY OF JACKSONVILLE, et al.,

      Defendants.

_____

WACKO'S TOO, INC., et al.,

      Plaintiffs,

v.                                                                    Case No. 3:22-cv-798-TJC-MCR

CITY OF JACKSONVILLE,

      Defendant.

_____

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In the long standing and never-ending battle of wills between the City of Jacksonville and adult entertainment establishments, the Court is once again required to determine whether the City's latest efforts at regulation meet constitutional requirements. Both cases involve challenges to Chapters 150 and 151 of the Jacksonville Code. Plaintiffs in the earlier-filed case, No. 3:20-cv-303 ("Wacko's I"), allege constitutional violations stemming from Jacksonville Ordinance 2020-74-E ("2020 Ordinance"). After a bench trial covering eleven of

the twenty-eight counts, the Court issued an Order ruling on seven counts and deferring four. The parties then briefed additional counts and settled others, leaving some remaining for the Court's adjudication. But before the Court ruled on the final issues in Wacko's I, the City Council passed Ordinance 2022-172-E ("2022 Ordinance"). Some amendments in the 2022 Ordinance attempted to address portions of Chapters 150 and 151 that the Court found unconstitutional in Wacko's I. This prompted the filing of the second case, No. 3:22-cv-798 ("Wacko's II"). The City has agreed to abate enforcement of the ordinances until the Court issues a final ruling on all issues in both cases.

Now, both cases are before the Court for resolution. In Wacko's I, the parties advised the Court of the remaining counts requiring determination, briefed them, and requested the Court determine them without argument. (See Docs. 40, 41, 90, 92, 95 in 3:20-cv-303). In Wacko's II, with the parties' agreement, the Court treated Plaintiffs' Motion for Preliminary Injunction as a merits brief. (Docs. 2, 19 in 3:22-cv-798). The City responded and Plaintiffs replied. (Docs. 24, 25 in 3:22-cv-798). The Court held a non-jury trial under Federal Rule of Civil Procedure 52 on December 15, 2022, the record of which is incorporated by reference. The Court now addresses all issues remaining in both cases.

While the Court will give a full explanation of its rulings below, the Court provides a brief summary up front. The Court is upholding as constitutional the

age restriction requiring performers to be at least twenty-one-years-old (though the current version will need to be revised). The Court also upholds several procedural aspects of the 2022 Ordinance but invalidates others, particularly some parts of the licensing scheme and certain penalty provisions in Chapters 150 and 151.

## I.   BACKGROUND

The Court reiterates facts from its post-trial Order in Wacko's I relevant to both cases. (See Doc. 39 in 3:20-cv-303); Wacko's Too, Inc. v. City of Jacksonville, 522 F. Supp. 3d 1132 (M.D. Fla. 2021) (Corrigan, J.). On February 25, 2020, the City of Jacksonville passed the 2020 Ordinance, which became effective March 5, 2020. (Doc. 1 ¶ 44 in 3:20-cv-303). The 2020 Ordinance amended Chapters 150 and 151 of the Jacksonville Code by instituting new licensing requirements for performers at adult entertainment establishments, among other changes. (See Doc. 1-1 in 3:20-cv-303). Chapter 150 regulates adult entertainment establishments that do not sell alcoholic beverages and have nude dancing. Chapter 151 regulates establishments that sell alcoholic beverages, but performers must wear some covering.

Under the 2020 Ordinance, any performer at an adult entertainment establishment in Jacksonville must obtain a Work Identification Card, and no one under age twenty-one is eligible for the required card. See id. at 9, 16. The 2020 Ordinance states that the licensing requirements and other restrictions

are designed to combat human trafficking and contains several "whereas" clauses regarding sex and human trafficking in the context of adult entertainment establishments. Id. at 1–5. After the Council passed the 2020 Ordinance, Plaintiffs in Wacko's I sued, attacking it as unconstitutional, largely under the First Amendment. (See Doc. 1 in 3:20-cv-303).

After a bench trial on some counts, the Court invalidated certain licensing provisions in the 2020 Ordinance as unconstitutional prior restraints because the Ordinance improperly provided the Sheriff unbridled discretion to decide performer license applications, allowed the Sheriff to delay decisions on the applications, and provided no avenue for relief if applications were not acted on. Wacko's Too, 522 F. Supp. 3d at 1145–48. The Court also struck down license application requirements of fingerprinting and proof of work eligibility, while allowing requirements of a photograph, dancer roster, and work card files to stand. Id. at 1149–51. But the Court determined that the performer age restriction issue needed more development. Id. at 1151–52. The parties filed additional briefing on the age restriction and other remaining issues. (Docs. 40, 41, 68 in 3:20-cv-303). The City then passed the 2022 Ordinance on April 26, 2022, amending the licensing provisions in Chapters 150 and 151 again. (Docs. 1 at ¶ 43, 1-1 in 3:22-cv-798).

The 2022 Ordinance altered portions of §§ 150.224 and 151.214 that the Court had determined were unconstitutional. (See Doc. 1-1 in 3:22-cv-798);

4

<u>Wacko's Too</u>, 522 F. Supp. 3d at 1144–55. For example, the City removed from § 150.224(c) the sentence permitting "[t]he Sheriff . . . to include whatever information he or she deem[ed] relevant" to issuing the Work Identification Card and added a list of specific information the application required from performers. (Doc. 1-1 at 3, 10–11 in 3:22-cv-798). The City Council kept the age restriction but added that the restriction would "not become effective unless and until the legality of this age restriction is determined to be valid or the City is otherwise not legally prevented from imposing this restriction." <u>Id.</u> at 4, 11–12.

From the 2022 Ordinance, Wacko's II arose. Plaintiffs bring five counts challenging portions of the 2022 Ordinance. (Doc. 1 in 3:22-cv-798). Like the Plaintiffs in Wacko's I, Plaintiffs in Wacko's II fall into three categories: (1) "Dancing entertainment establishments," called "bikini bars," regulated primarily by Chapter 151 that "provide live exotic dance performances in a nightclub format where alcoholic beverages are sold," and where performers wear coverings over their breasts, buttocks, and pubic regions; (2) Sinsations, an "adult entertainment establishment" regulated primarily under Chapter 150, that operates a "juice bar" with no alcoholic beverages and has nude dancing in a nightclub setting; and (3) individual performers who have worked at one or more of the establishments.[1] (See Doc. 1 ¶¶ 9–20 in 3:22-cv-798);

---

[1] The Court uses "adult entertainment establishments" or "Club Plaintiffs" to refer to dancing entertainment establishments (bikini bars) and

Wacko's Too, 522 F. Supp. 3d at 1140. Five adult entertainment establishments are Plaintiffs in both cases. Now the Court must determine the remaining issues regarding the constitutionality of both the 2020 and 2022 Ordinances' regulations of adult entertainment establishments and performers at those establishments.

The Supreme Court has recognized erotic dancing as falling in the First Amendment's "outer ambit." See, e.g., City of Erie v. Pap's A.M., 529 U.S. 277, 289 (2000) ("As we explained in Barnes, . . . nude dancing . . . is expressive conduct, although we think it falls only within the outer ambit of the First Amendment's protection."); Fly Fish, Inc. v. City of Cocoa Beach, 337 F.3d 1301, 1305 n.7 (11th Cir. 2003) ("The Supreme Court has recently reaffirmed that nude dancing of the type at issue here is expressive conduct that falls within the outer ambit of the First Amendment."). However, within certain constitutional confines, municipalities may regulate adult entertainment due to its negative secondary effects. See generally Redner v. Dean, 29 F.3d 1495, 1499 (11th Cir. 1994) ("While it enjoys some degree of First Amendment protection . . . nude dancing is not immune from governmental regulation."). Examples of permissible governmental regulation of adult entertainment

---

adult entertainment establishments (Sinsations or juice bars) together. When the Court distinguishes between the two, the Court refers to them as "bikini bars" or "Sinsations" or "juice bars."

establishments include zoning restrictions, limiting or banning alcohol sales, and limiting hours of operation. See, e.g., Doe I v. Landry, 909 F.3d 99, 110 (5th Cir. 2018); Am. Entertainers, LLC v. City of Rocky Mount, 888 F.3d 707, 716, 723 (4th Cir. 2018); Fly Fish, Inc., 337 F.3d at 1315; Schultz v. City of Cumberland, 228 F.3d 831, 845–46, 848 (7th Cir. 2000); Lady J. Lingerie, Inc. v. City of Jacksonville, 176 F.3d 1358, 1365 (11th Cir. 1999). These cases thus involve a recognized form of First Amendment expression, but one that the City may regulate within limits.

## II.   WACKO'S I AND II — CONSTITUTIONALITY OF PERFORMER AGE RESTRICTION

One issue arises in both Wacko's I and II. The 2020 and 2022 Ordinances both forbid anyone under age twenty-one from receiving the requisite Work Identification Card to perform at adult entertainment establishments in Jacksonville. The 2020 Ordinance states:

> Each applicant must submit proof of identity and proof that applicant is at least twenty-one (21) years of age. Work identification cards shall not be issued to any person under the age of twenty one [sic].

§§ 150.224(c), 151.214(c); (Doc. 1-1 at 8–9, 16 in 3:20-cv-303). The 2022 Ordinance amended this language, stating that the City intends to enact the age restriction, but that the restriction is not effective until certain events occur:

> Each applicant must submit proof of identity at the time the application is submitted. It is the Council's intent that no Work Identification Card shall be issued to any applicant who is under

the age of twenty-one (21) years of age; however, this requirement shall not become effective unless and until the legality of this age restriction is determined to be valid or the City is otherwise not legally prevented from imposing this restriction.

§§ 150.224(c), 151.214(c); (Doc. 1-1 at 4, 11–12 in 3:22-cv-798). The issue is whether the restriction prohibiting performers, aged eighteen to twenty-years-old, from dancing at adult entertainment establishments is constitutional.

At the outset, the Court finds that the age restriction as stated in the 2022 Ordinance is unconstitutionally vague. A law is impermissibly vague when "it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "it authorizes or even encourages arbitrary and discriminatory enforcement." Hill v. Colorado, 530 U.S. 703, 732 (2000); see also Jordan v. De George, 341 U.S. 223, 231–32 (1951) (procedural due process requires laws give "sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices."). In the First Amendment context, vague laws are especially problematic when they inhibit free expression. See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498–99 (1982); Grayned v. City of Rockford, 408 U.S. 104, 108–09 (1972). The 2022 Ordinance does not provide fair notice of when the age restriction will be enforceable. A person of ordinary intelligence would not know when "the legality of this age restriction is determined to be valid" or when "the City is otherwise not legally prevented from imposing this restriction." (Doc. 1-

1 at 4, 11–12 in 3:22-cv-798). And the Ordinance provides no way for a person to find out whether these events have occurred. Sections 150.224(c) and 151.214(c) are unconstitutionally vague so far as they contain the age restriction. The Court thus grants permanent injunctive relief as to Count IV in Wacko's II because the age restriction is vague. (See Doc. 1 at ¶¶ 119–23 in 3:22-cv-798).[2]

Nevertheless, the Court will still resolve the primary question of the constitutionality of the age restriction in the 2020 and 2022 Ordinances. Although a change to a law may moot a legal challenge, mootness does not occur if there is a substantial likelihood a challenged provision will be re-enacted. See McGuire v. Marshall, 50 F.4th 986, 999 (11th Cir. 2022). As the 2020 Ordinance imposed an unequivocal age restriction, the 2022 Ordinance stated the City's intent to enforce that restriction going forward, and the parties have agreed the issue is not moot, the challenge to the age restriction's constitutionality remains live.

In Wacko's I, Plaintiffs argue that the age restriction for performers runs afoul of the First Amendment because it is not narrowly tailored (Count IV) and is underinclusive (Count VI). (Doc. 1 ¶¶ 127–38, 151–57 in 3:20-cv-303). When

---

[2] While the City's effort to delay implementation of the age restriction pending Court review was no doubt well-intentioned, it created a vagueness problem.

the Court sought supplemental briefing on the matter, it asked for certain

questions to be answered:

> (1) [W]hether any court has ever upheld or struck down such a ban; (2) the precise nature of the restriction that was upheld by the Fifth Circuit in <u>Doe I</u>, 909 F.3d 99 (which was less than a total ban), and whether the reasoning of <u>Doe I</u> is fully applicable to the Ordinance; (3) whether the evidence the City adduced at trial about the relationship between age and human trafficking was presented to the City Council at the time it was considering the Ordinance, and whether that matters; (4) whether the City considered any less restrictive age-based alternatives; (5) whether other age restrictions such as those on purchasing alcohol or owning firearms are relevant to this analysis; (6) whether the Court should allow an evidentiary record, including trial testimony, to be developed before ruling on the issue, or if allowing additional evidence is inconsistent with deciding a facial challenge; and (7) any other relevant arguments.

<u>Wacko's Too</u>, 522 F. Supp. 3d at 1151–52 (footnote omitted). With the benefit of

additional briefing, both sides ask the Court to rule on this issue without more

factual development. (<u>See</u> Doc. 90 ¶ 6 in 3:20-cv-303). In Wacko's II, Plaintiffs

allege in Count II that the age restriction contained in the 2022 Ordinance

violates the First Amendment for the same reasons raised in Wacko's I. (Doc. 1

¶¶ 97–106 in 3:22-cv-798). The Wacko's II parties similarly agree the Court

needs no further factual development. (<u>See</u> Doc. 19 ¶ 1 in 3:22-cv-798).

## A.   Content-Based or Content-Neutral

To determine whether the age restriction is constitutional, the Court first

asks whether the regulation is content-based or content-neutral. "The principal

inquiry in determining content neutrality, in speech cases generally and in

time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (citing Clark v. Community for Creative Non–Violence, 468 U.S. 288, 295 (1984)). A regulation is content-neutral when it is "justified without reference to the content of the regulated speech . . . ." Clark, 468 U.S. at 293. "The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." Ward, 491 U.S. at 791 (citing City of Renton v. Playtime Theaters, Inc., 475 U.S. 41, 47–48 (1986)).

The Supreme Court's discussion of Renton in Boos v. Barry, 485 U.S. 312, 320 (1988), is instructive:

> The regulation at issue in Renton described prohibited speech by reference to the type of movie theater involved, treating theaters that specialize in adult films differently from other kinds of theaters. But while the regulation in Renton applied only to a particular category of speech, its justification had nothing to do with that speech. The content of the films being shown inside the theaters was irrelevant and was not the target of the regulation. Instead, the ordinance was aimed at the secondary effects of such theaters in the surrounding community, effects that are almost unique to theaters featuring sexually explicit films, i.e., prevention of crime, maintenance of property values, and protection of residential neighborhoods. In short, the ordinance in Renton did not aim at the suppression of free expression.

(citations, alterations, and quotation marks omitted). Because the ordinance in Renton "did not aim at the suppression of free expression," it was deemed content-neutral. Id. at 320–21.

As in Renton, the age restriction here does not aim at the suppression of free speech—it instead aims to curtail the negative secondary effects of having vulnerable eighteen to twenty-year-old performers exposed to human and sex trafficking. "[R]egulations that target undesirable secondary effects of protected expression are deemed content-neutral, and courts review them with an intermediate level of scrutiny known as the O'Brien test." Artistic Ent., Inc. v. City of Warner Robins, 223 F.3d 1306, 1308–09 (11th Cir. 2000) (holding that the city council had an adequate evidentiary basis to find that the restriction on alcohol sales and consumptions at adult businesses would reduce negative secondary effects); see also Zibtluda, LLC v. Gwinnet Cnty., Ga., 411 F.3d 1278, 1284 (11th Cir. 2005) ("The Supreme Court has made clear that when the purpose of an adult entertainment ordinance is to ameliorate the secondary effects of adult businesses, intermediate scrutiny applies."); Ranch House, Inc. v. Amerson, 238 F.3d 1273, 1283 (11th Cir. 2001) ("We do not conceive of this burden [to invoke the secondary effects doctrine] as a rigorous one."); Discotheque, Inc. v. Augusta-Richmond Cnty., Ga., No. 21-13218, 2022 WL 5077263, *6–8 (11th Cir. Oct. 5, 2022) (finding intermediate scrutiny satisfied

by ordinance aiming to combat negative secondary effects stemming from adult entertainment establishments).[3]

The most analogous case about adult entertainment performer age restrictions is <u>Doe I v. Landry</u>, 909 F.3d 99 (5th Cir. 2018), which the City cited in a "whereas" clause to the 2020 Ordinance. (Doc. 1-1 at 4–5 in 3:20-cv-303). In <u>Doe I</u>, the Fifth Circuit dealt with 2016 amendments to Louisiana statutes that required performers whose breasts or buttocks are exposed at clubs serving alcohol to be twenty-one or older. 909 F.3d at 104. In determining whether the district court properly held that the restriction was content-neutral, the Fifth Circuit noted that "[t]he statute's predominant purpose determines the level of scrutiny," that "a preamble or legislative history is not required to support a content-neutral purpose," and that "the burden on expression is incidental to the content-neutral exercise of authority to regulate sexually oriented businesses." <u>Id.</u> at 107–08. The Fifth Circuit concluded that the regulation was not content-based. <u>Id.</u> at 108.

Likewise in a recent case, <u>DC Operating, LLC v. Paxton</u>, 586 F. Supp. 3d 554, 562 (W.D. Tex. 2022),[4] the district court considered a bill that amended

---

[3] The Court does not rely on unpublished opinions as binding precedent; however, they may be cited when the Court finds them persuasive on a particular point. <u>See</u> <u>McNamara v. GEICO</u>, 30 F.4th 1055, 1060-61 (11th Cir. 2022).

[4] The parties in <u>DC Operating</u> appealed the decision and the case is

13

portions of Texas's laws to effectively raise the minimum legal age from eighteen to twenty-one for patrons and employees, including performers, in a sexually oriented business. [5] The bill's age restriction aimed at preventing human trafficking in those businesses, not to curtail protected expression. Id. at 566–68. The district court concluded the bill was not content-based and applied intermediate scrutiny in analyzing the bill's constitutionality under the First Amendment. Id.

Here, the City's justification for the age restriction is its desire to "reduce or prevent human and sex trafficking . . . ." (Doc. 1-1 at 1 in 3:20-cv-303). The

_____

currently before the Fifth Circuit.

[5] On November 12, 2021, the City filed Defendants' Notice of Supplemental Authority and Opposed Motion for Judicial Notice, informing the Court of the Texas law at issue in DC Operating, Texas Senate Bill 315. (Doc. 63 in 3:20-cv-303). The City requests that the Court take judicial notice of the signing of the law on May 23, 2021 and of the law's legislative history. (Docs. 63, 62-1, 62-2, 62-3, 62-4 in 3:20-cv-303). Plaintiffs filed a response in opposition arguing that the Court may take judicial notice of the enactment of Texas Senate Bill 315 and of the legislative history associated with its enactment, but that the Court should not "treat as an adjudicative fact any of the materials, conclusions, statements or findings in the Texas legislative history." (Doc. 66 at 2 in 3:20-cv-303). The Court concurs. Thus, Defendants' Opposed Motion for Judicial Notice (Doc. 63 in 3:20-cv-303) is **GRANTED in part** to the extent that the Court takes judicial notice of the enactment of Texas Senate Bill 315 on May 23, 2021 and of the legislative history associated with its enactment, which the City submitted along with its Motion, but does not consider the legislative history or the other materials as adjudicative facts. By extension, the Court has reviewed cases challenging the Texas bill's constitutionality. See DC Operating, 586 F. Supp. 3d 554; Valadez v. Paxton, 553 F. Supp. 3d 387, 394–97 (W.D. Tex. 2021) (applying intermediate scrutiny and denying preliminary injunctive relief).

City elaborates on how age relates to human and sex trafficking through several "whereas" clauses in the 2020 Ordinance:

> WHEREAS, victims of sex trafficking are frequently recruited to work as performers or employees in strip clubs; and
>
> WHEREAS, researchers have found that sex trafficking victims are more likely to be trafficked by someone from within her or his own community; and
>
> WHEREAS, persons under the age of twenty-one are more likely to still remain within and dependent on the community in which they were raised; and
>
> WHEREAS, research studies have identified the average age at which a person in the United States enters the sex trade for the first time is age seventeen (17)[.]

(Doc. 1-1 at 3–4 in 3:20-cv-303). Given these reasons, "[t]he ordinance does not contravene the fundamental principle that underlies [the Supreme Court's] concern about 'content-based' speech regulations: that 'government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views.'" Renton, 475 U.S. at 48–49 (quoting Police Dept. of City of Chicago v. Mosley, 408 U.S. 92, 96 (1972)). As in Doe I, the age restriction does not prohibit erotic dancing itself, but rather the age of those who may perform at adult entertainment establishments, for a reason distinct from the content of expression—because performers' youth makes them particularly vulnerable to human and sex trafficking. "So long as the purpose of the statute is unrelated to the suppression

15

of the expressive conduct, the statute is content-neutral." <u>Fly Fish, Inc.</u>, 337 F.3d at 1305 (citing <u>Barnes v. Glen Theatre, Inc.</u>, 501 U.S. 560, 570–71 (1991)).

Plaintiffs counter with two cases involving age restrictions in the adult entertainment context where courts found the restrictions to be content-based. But these cases are distinguishable and unpersuasive. In <u>State of Georgia v. Café Erotica</u>, 500 S.E.2d 574, 576–77 (Ga. 1998), the Georgia Supreme Court found a law to be a content-based regulation where it banned eighteen to twenty-year-old patrons from establishments exhibiting adult performances. Critically, the law sought to eliminate "the exhibition of harmful material to minors . . . ." <u>Id.</u> at 576. The Georgia Supreme Court therefore found the law to be "predicated on the content of the regulated speech," and thus a content-based restriction. <u>Id.</u> at 576–77. Similarly, the district court in <u>T. Weston, Inc. v. Mineral Cnty., W.Va.</u>, No. 2:04–CV–56, 2008 WL 3474146, at *10, (N.D. W. Va. Aug. 12, 2018), found a law forbidding anyone under twenty-one-years-of-age from entering a business offering exotic entertainment to be a content-based restriction. But there, the district court considered analogous cases that involved a patron's right to view sexually explicit material. <u>Id.</u> at *10–11. The 2020 Ordinance's age restriction is narrower, as it only raises the age of performers and does so for a secondary purpose unrelated to the content of the

performances.[6]

The Eleventh Circuit's discussion in <u>Fly Fish</u> provides more rationale that the age restriction is content-neutral:

> The Supreme Court has identified a third category of regulation of expressive conduct. These regulations define the regulated conduct by its expressive content, and, to this extent, they are content-based. Their purpose, however, is not to ban the expressive conduct, but merely to establish restrictions on the time, place, and manner of its presentation. Although content-based, such a regulation will be treated as if it were content-neutral if it serves a substantial government purpose that is unrelated to the suppression of the expressive conduct.

> In the context of adult entertainment, the [Supreme] Court held that this purpose can be located in combating the harmful secondary effects of that conduct on the surrounding community.

337 F.3d at 1306 (citations and quotation marks omitted).

Here, the age regulation is in place to combat the "negative secondary effects" of adult entertainment establishments on young performers vulnerable to human and sex trafficking. (<u>See</u> Docs. 1-1 at 4, 5, 25 at 5, 16 in 3:20-cv-303). The 2020 Ordinance states that it is meant to be a time, place, and manner

---

[6] Plaintiffs also cite <u>Essence, Inc. v. City of Fed. Heights,</u> 285 F.3d 1272 (10th Cir. 2002) for support that the age restriction is unconstitutional. <u>Essence</u> involved a regulation prohibiting anyone under twenty-one from entering the premises of an establishment presenting live nude dancing. <u>Id.</u> at 1283. In its analysis of the regulation's constitutionality, the Tenth Circuit never determined whether the regulation functioned as a content-based or content neutral restriction because it found the regulation failed the lower standard of intermediate scrutiny. <u>Id.</u> <u>Essence</u> is thus not helpful to the determination of which scrutiny applies here.

regulation. (Doc. 1-1 at 5 in 3:20-cv-303). Though the age restriction here may not be a traditional time, place, and manner restriction on speech, the analogy is still useful. Like the restriction in <u>Fly Fish</u>, the 2020 Ordinance's age restriction is a bit of a "constitutional orphan," not fitting perfectly into the category of content-neutral or content-based. 337 F.3d at 1306. Given the City's non-speech-related rationale of combatting the secondary effects of harm to young performers, the Court finds the regulation to be content-neutral.

## B.    Intermediate Scrutiny

To pass constitutional muster, a content-neutral regulation must survive intermediate scrutiny. <u>Artistic Ent.</u>, 223 F.3d at 1308. There are two tests under the umbrella of intermediate scrutiny: the <u>O'Brien</u> and <u>Renton</u> tests. <u>See</u> <u>United States v. O'Brien</u>, 391 U.S. 367 (1968); <u>Renton</u>, 475 U.S. 41 (1986). "[A]s a practical matter, there is little difference between them[,]" but the Eleventh Circuit recently recognized that the choice of test may alter the result in some cases. <u>Club Madonna Inc. v. City of Miami Beach</u>, 42 F.4th 1231, 1244 (11th Cir. 2022) (internal alterations and quotation marks omitted) (quoting <u>Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale</u>, 11 F.4th 1266, 1297 (11th Cir. 2021)). In <u>Club Madonna</u>, the Eleventh Circuit articulated the circumstances when each test applies:

> The <u>O'Brien</u> test is used to evaluate regulations of expressive conduct -- conduct that contains both speech and nonspeech elements. In contrast, the time, place, and manner test outlined in

> Renton has generally been used to review restrictions on
> expression taking place in public fora and evaluate the validity of
> zoning regulations. Renton instructs us that a time, place, and
> manner regulation must be narrowly tailored to serve a
> substantial governmental interest, while still allowing for
> reasonable alternative avenues of expression . . . . However, in
> Lady J. Lingerie v. City of Jacksonville, we observed that the tests
> are not the same, and they may lead to different results. We
> suggested that the time, place, and manner test provides more
> breathing room to the government because the O'Brien test
> requires slightly more narrow tailoring than the time, place, and
> manner test. The O'Brien test is slightly more searching because
> it evaluates laws that regulate expressive conduct, while the time,
> place, and manner test analyzes laws that regulate speech
> indirectly.

Id. at 1244. (internal citations, alterations, and quotation marks omitted).

"Courts have long applied the O'Brien test to the regulation of adult entertainment." Artistic Ent., 223 F.3d at 1308 (citing Renton, 475 U.S. at 47–49; Sammy's of Mobile, Ltd. v. City of Mobile, 140 F.3d 993, 996 (11th Cir. 1998)). Because the age restriction does not qualify neatly either as a regulation on expressive conduct under O'Brien, or a pure time, place, and manner restriction under Renton, the Court errs on the side of applying the "slightly more searching" O'Brien test. Club Madonna, 42 F.4th at 1244; see also Doe I, 909 F.3d at 108–13 (applying, as the district court did, the O'Brien test).

A law survives O'Brien: "[1] if it is within the constitutional power of the Government; [2] if it furthers an important or substantial governmental interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on alleged First Amendment

freedoms is no greater than is essential to the furtherance of that interest." O'Brien, 391 U.S. at 377; see also Flanigan's Enterprises, Inc. v. Fulton Cnty., 596 F.3d 1265, 1277 (11th Cir. 2010) (rephrasing four-factor test). Put another way, a law is valid under O'Brien "if (1) the law is grounded in a substantial governmental interest, and (2) the incidental restriction on speech is no broader than necessary to further that interest." Club Madonna, 42 F.4th at 1242 (citing Arcara v. Cloud Books, 478 U.S. 697, 702–03 (1986)).

"Harmful secondary effects can include the impacts on public health, safety, and welfare." Doe I, 909 F.3d at 109 (quoting Pap's A.M., 529 U.S. at 291). Attempting to curtail human and sex trafficking constitutes a substantial government interest. See, e.g., Club Madonna, 42 F.4th at 1245 (finding that the prevention of human trafficking clubs constituted a substantial government interest). Thus, the Court must determine whether the age restriction is appropriately tailored to further that end.

In Doe I, the state had to show "a connection between the actions being regulated—erotic dancing by 18, 19, and 20-year-olds and alcohol consumption—and the claimed secondary effects." 909 F.3d at 109. Courts have "allowed such regulations to be justified by evidence that may not have been presented to the enacting officials and was only produced at the time of trial." Id. at 110 (citing J&B Ent., Inc. v. City of Jackson, 152 F.3d 362, 371–72 (5th Cir. 1998) ("Justice Souter's concurrence in Barnes . . . allows a local

government to justify a challenged ordinance based on evidence developed either prior to enactment or adduced at trial."). The Eleventh Circuit has held that "any evidence 'reasonably believed to be relevant'. . . may form an adequate predicate to the adoption of a secondary effects ordinance, but the government must rely on at least <u>some</u> pre-enactment evidence." <u>Peek-A-Boo Lounge of Bradenton, Inc v. Manatee Cnty., Fla.</u>, 337 F.3d 1251, 1268 (11th Cir. 2003) (emphasis in original). There was some pre-enactment evidence of the negative secondary effects of human trafficking vis-à-vis young performers before the City Council prior to the enactment of the 2020 Ordinance. (<u>See e.g.</u>, Docs. 30-1 ¶¶ 5, 6, 30-2 at 2, 30-3 in 3:20-cv-303).[7] At this stage, the entire record the City presented at trial is pertinent no matter if it was directly before the City Council when it enacted the 2020 Ordinance.[8]

As in <u>Doe I</u>, here, the City must provide a reasonable basis supporting that the age restriction furthers the City's interest in preventing the targeted secondary effects of human and sex trafficking. See <u>Zibtluda, LLC</u>, 411 F.3d at

---

[7] A portion of the documents filed by the City were attached to the 2020 Ordinance. (<u>See</u> Doc. 30-2 at 2 in 3:20-cv-303). In addition, the City submitted an affidavit by Council Member LeAnna Cumber, who introduced the 2020 Ordinance, in which she stated that she personally relied on all of the documents contained in the record submitted by the City, including those not attached to the 2020 Ordinance, to support the age restriction and other aspects of the licensing scheme. (Doc. 30-1 ¶ 5 in 3:20-cv-303).

[8] In enacting the 2022 Ordinance, the City did not rely on additional evidence.

1286 ("[T]he government need only have a reasonable basis . . . for believing that its policy will indeed further a legitimate interest.") (quotation marks and citation omitted); <u>Doe I</u>, 909 F.3d at 109–10. A reasonable basis "can consist of the experience of other cities, studies done in other cities, caselaw reciting findings on the issue, as well as [the officials'] own wisdom and common sense." <u>Zibtluda, LLC</u>, 411 F.3d at 1286 (alteration in original). "The factual basis may come from a number of places [and] [a] city need not conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." <u>Flanigan's Enterprises</u>, 596 F.3d at 1278 (internal quotation marks omitted) (quoting <u>Daytona Grand, Inc. v. City of Daytona Beach</u>, 490 F.3d 860, 875 (11th Cir. 2007)); <u>cf.</u> <u>Essence, Inc.</u>, 285 F.3d at 1284, 1286–88 (holding that a law banning persons—both patrons and performers—under twenty-one from entering nude dancing establishments failed the fourth <u>O'Brien</u> prong because the city fell short of showing the law would "further its mission" in preventing the purported secondary effects associated with nude dancing, including decreasing property values, increasing crime, and sexually transmitted diseases). "Ultimately, the test hinges on the reasonableness of the government regulation in light of the available evidence[.]" <u>Flanigan's Enterprises</u>, 596 F.3d at 1279. "The test requires

deference to the reasoned judgment of a governmental entity" and "very little evidence is required." Id. (quoting Daytona Grand, 490 F.3d at 880).

The City presented studies and articles to support the need for a performer age restriction at adult entertainment establishments. Those excerpted here are part of an over five-hundred-page record provided by the City:

- "A Note About 'Average Age of Entry,'" "123 of the 292 survivors whose accounts were analyzed disclosed their age when they first engaged in commercial sex to the NHTRC [National Human Trafficking Resource Center] or BeFree Textline. 44% of these survivors estimated that they were 17 or younger, and the average age of first participation was 19 years old." (Doc. 30-3 at 77 in 3:20-cv-303) (emphasis in original) (excerpted from POLARIS, Sex Trafficking in the U.S.: A Closer Look at U.S. Citizen Victims). The report also includes a graphic that shows that an estimated thirty-eight percent of survivors are fourteen to seventeen years old at the time of their first commercial sex act, while an estimated thirty-five percent are eighteen to twenty-one. Id. at 78.

- "The warning signs of human sex trafficking include the presence of strip clubs and 'streetwalkers.' The FBI has also reported that certain locations such as truck stops, massage parlors, and strip clubs are often havens for sex trafficking. An FBI task force in Portland, Oregon, a hot spot for human sex trafficking, found a huge overlap between strip clubs and the sex trade. One member of the task force stated, 'It's no secret that pimps and traffickers will go to strip clubs to try to find girls to traffic and promote or compel into prostitution.' In another investigation of four strip clubs that was led by agents of the FBI, IRS, and local police, graphic court filings detailed how in the dimly lit 'VIP' rooms, dancers and patrons engaged in open sex acts for money." (Doc. 30-7 at 45 in 3:20-cv-303) (footnotes omitted) (excerpted from Dan O'Bryant, Inextricably Bound:

<u>Strip Clubs, Prostitution, and Sex Trafficking</u>, 2 DIGNITY: J. SEXUAL EXPLOITATION & VIOLENCE 3, 3 (2017)).

- "Victims of sex trafficking are frequently recruited to work in strip clubs across the United States. Women, men, and minors may be recruited to work in strip clubs as hostesses, servers or dancers, but then are required to provide commercial sex to customers. Individuals forced to serve as hostess [sic], servers, or dancers but not required to provide commercial sex may still be victims of labor trafficking. Strip clubs are designed to provide the space and environment in which buyers may purchase commercial sex. Victims of sex trafficking in strip clubs must adhere to extensive, pre-determined schedules and are frequently moved between multiple clubs. Commercial sex sometimes takes place in the bathroom, VIP, or lap dance rooms, or offsite in hotels or buyer's [sic] homes." (Doc. 30-7 at 52 in 3:20-cv-303) (excerpted from NATIONAL HUMAN TRAFFICKING HOTLINE, <u>Hostess/Strip Club-Based</u>).

- "Victims of sex trafficking in strip clubs may be women, men or minors, though it is more common for females to be induced into commercial sex in this venue." (Doc. 30-7 at 53 in 3:20-cv-303) (excerpted from NATIONAL HUMAN TRAFFICKING HOTLINE, <u>Hostess/Strip Club-Based</u>).

- "A Scores strip club in Florida hired a 'severely' disabled 17-year-old sex trafficking victim with a fake ID and allowed her to be groped and molested by adult men, a scathing lawsuit filed Wednesday alleges." (Doc. 30-8 at 55 in 3:20-cv-303) (excerpted from Gabrielle Fonrouge, <u>Scores strip club sued for allowing sex trafficking of disabled teen</u>, N.Y. POST, Jan. 29, 2020)."[9]

Along with this record, there are fourteen "whereas" clauses in the text of the Ordinance that codify the reasons for implementation:

---

[9] At trial, the City mistakenly asserted that Scores is one of the Club Plaintiffs in Wacko's I. (Doc. 36 at 90:9–10). It is not a party in either case.

WHEREAS, Florida is ranked third nationally for reported cases of human trafficking abuses, many of which involved sex trafficking; and

WHEREAS, strip clubs and hotels/motels are widely recognized as being a significant part of the sex trafficking network used by traffickers to coerce and facilitate men, women and children into performing sexual acts, which places the employees of these establishments in direct and frequent contact with the victims of human trafficking; and

WHEREAS, in 2019, the American Hotel & Lodging Association ("AHLA") launched its, "No Room for Trafficking" campaign, which established the goal of training every hotel employee to spot and stop trafficking; and

WHEREAS, on January 9, 2020, the AHLA, the Florida Restaurant & Lodging Association, the Asian American Hotel Owners Association, the National Football League, Florida Attorney General Ashley Moody and various state and federal officials met to develop a prevention and response campaign concerning use of Florida's hotel industry for sex trafficking during and around Super Bowl LIV in Miami; and

WHEREAS, hotels and motels are a crucial piece of the infrastructure necessary to facilitate human trafficking (particularly sex trafficking) in escort services – of the 3,596 cases of human trafficking reported to the National Hotline to be occurring at a hotel, 2,920 or 81 percent of those involved sex trafficking; and

WHEREAS, victims of sex trafficking are frequently recruited to work as performers or employees in strip clubs; and

WHEREAS, researchers have found that sex trafficking victims are more likely to be trafficked by someone from within her or his own community; and

WHEREAS, persons under the age of twenty-one are more likely to still remain within and dependent on the community in which they were raised; and

WHEREAS, research studies have identified the average age at which a person in the United States enters the sex trade for the first time is age seventeen (17);

WHEREAS, because of the prevalence of human and sex trafficking among Florida's youth population, on September 30, 2019, Florida's State Board of Education voted unanimously to make Florida the first state in the country to require child trafficking prevention education for all public education students in grades K-12; and

WHEREAS, on January 14, 2020, the U.S. Department of Justice hosted the Summit on Combating Human Trafficking to focus attention on and highlight the federal government's efforts to address all aspects of human trafficking; and

WHEREAS, on February 3, 2020, the Council conducted a Sex Trafficking workshop at which representatives from the Jacksonville Sheriff's Office, the Federal Bureau of Investigation and the Department of Homeland Security provided information and statistics on human and sex trafficking, as well as endorsing the means established in this legislation as appropriate and meaningful to reduce or prevent these activities from occurring in Jacksonville; and

WHEREAS, sex trade at strip clubs is a common occurrence in Jacksonville, thereby subjecting performers at these strip clubs to frequent propositions and enticements to engage in sex trade actions and sex trafficking from customers, as well as strip club employees, managers and owners; and

WHEREAS, on November 16, 2018, the federal Fifth Circuit Court of Appeals, in the case of Jane Doe I v. Landry, reported at 909 F.3d 99 (5th Cir. 2018), upheld a regulation enacted by the State of Louisiana to prohibit persons under the age of twenty-one from nude erotic dancing at establishments serving alcohol on the grounds that such a regulation furthered the state's interests in curbing human trafficking and prostitution[.]

(Doc. 1-1 at 3–5 in 3:20-cv-303). Section two of the 2020 Ordinance, titled "Intent and severability," further asserts: "It is the Council's intent that these regulations be interpreted and applied to not eliminate all forms of adult entertainment, but instead, to be narrowly tailored and limited to combating negative secondary effects on a vulnerable segment of our City's population and to provide a means of licensing and permitting to assist in reducing criminal activities occurring at these facilities." Id. at 5.

This record appears to include more than the Fifth Circuit relied on when it upheld the age restriction in Doe I.[10] See Doe I, 909 F.3d at 109–10 (considering a report from the Bureau of Alcohol, Tobacco, and Firearms and evidence compiled by the City of New Orleans). While the legislative record supporting the age restriction here could have been more robust, it need not rise to the quantum of proof required in a judicial setting. See Zibtluda, LLC, 411 F.3d at 1286; Flanigan's Enterprises, 596 F.3d at 1279.[11] The record

---

[10] Albeit the Doe I restriction was slightly narrower because it applied only to clubs licensed to serve alcohol and where performers' breasts or buttocks were exposed. Doe I, 909 F.3d at 104. The age restriction here is meant to apply both to clubs where alcohol is served but performers cannot be completely nude (the majority of Jacksonville's clubs), as well as to clubs where alcohol is not served but performers can be completely nude (Sinsations).

[11] On November 24, 2021, Plaintiffs submitted an Opposed Request for Judicial Notice of Adjudicative Facts: No Human Trafficking Arrests at Plaintiffs' Establishment and No Evidence of Arrests at Other Regulated Establishments. (Doc. 67 in 3:20-cv-303). Plaintiffs request notice of "[t]he lack of human trafficking arrests at the City's adult clubs," arguing that such information disputes the substantiality of the government's interest, and

sufficiently supports that the age restriction is rooted in the reasonable basis that the restriction furthers the City's interest in reducing human and sex trafficking.

Finally, the age restriction is "no broader than necessary to further" the City's interest. Club Madonna, 42 F.4th at 1242 (citing Arcara, 478 U.S. at 702–03) (elucidating the O'Brien test).[12] "[A]n incidental burden on speech is no

_____

demonstrates the underinclusive nature of the regulation and the lack of narrow tailoring. Id. at 7. Plaintiffs attach documents from discovery, including Defendant's Objections and Response to Plaintiffs' Request for Production (Doc. 67-1 in 3:20-cv-303), Defendant N. O. Archbold's Response to First Request for Admissions (Doc. 67-2 in 3:20-cv-303), and the Deposition of N.S. Eddy (Doc. 67-3 in 3:20-cv-303). According to Plaintiffs, the City's responses indicate that the City "has not made a single human trafficking arrest at Plaintiffs' businesses during the last five years and has no record of any such arrest at any other regulated establishment . . . ." (Doc. 67 at 1 in 3:20-cv-303).

The request, to which the City did not respond, is **GRANTED** to the extent that the Court considers the additional documents that Plaintiffs provide. (See Docs. 67-1, 67-2, 67-3 in 3:20-cv-303). Given the entire record, these documents do not change the Court's analysis of the age restriction. Even assuming arguendo that Plaintiffs' interpretation of the City's responses is accurate, that does not mean the City did not otherwise have a legislative basis to put the age restriction in place.

[12] In his concurrence in Club Madonna, Judge Newsom identified confusion existing in Eleventh Circuit and Supreme Court case law surrounding the application of the narrow tailoring requirement under O'Brien:

> It's bad enough that we have two different intermediate-scrutiny standards vying against one another, but to make matters worse, they are, to an extent, internally problematic. Most notable, of course, are the "judge-empowering" buzzphrases—"not substantially broader than necessary," "no greater than is essential," etc. See [United States v. Jimenez-Shilon, 34 F.4th 1042, 1054 (11th Cir. 2022)] (Newsom, J., concurring). And even within the individual strands, there seem to be fairly obvious

greater than is essential, and therefore is permissible under O'Brien, so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." United States v. Albertini, 472 U.S. 675, 689 (1985). A law is not invalid even if "there is some imaginable alternative that might be less burdensome on speech." Id. (citing Clark, 468 U.S. at 299). Moreover, "[t]he validity of such regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests." Id.

The City chose an age range in which its evidence sufficiently establishes that young, vulnerable performers may be particularly susceptible to human and sex trafficking. The restriction limits the age of erotic dancers in a space—adult entertainment establishments—that has been shown to present unique

---

incoherences. To take just one example, the Supreme Court has said that the O'Brien standard does not require (buzzphrase alert) a "least restrictive means analysis." City of Erie v. Pap's A.M., 529 U.S. 277, 301–02, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (plurality op.); see also Turner Broad. Sys. v. FCC, 512 U.S. 622, 662, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) ("To satisfy this [O'Brien] standard, a regulation need not be the least speech-restrictive means of advancing the Government's interests."). But as a matter of ordinary English, how is a standard that requires a restriction to be "no greater than is essential to the furtherance" of a government interest, O'Brien, 391 U.S. at 377, 88 S.Ct. 1673 (emphasis added), not a least-restrictive-means requirement? I, for one, just don't get it.

42 F.4th at 1262–63 (emphasis in original).

dangers related to sex trafficking. Those twenty-one and older are still free to participate in erotic dancing at adult entertainment establishments, and those eighteen to twenty may still perform in fora outside adult entertainment establishments and may perform in such establishments upon turning twenty-one. As the City states, the age restriction "only delay[s] when young dancers may work in strip clubs, removing prime targets for traffickers and reducing criminal activity overall at the strip clubs." (Doc. 41 at 18 in 3:20-cv-303). Thus, the restriction furthers the City's substantial government interest in combatting human trafficking and is appropriately tailored.[13]

---

[13] The Court applied the more stringent of the two intermediate scrutiny tests. However, the choice of test—O'Brien or Renton—is not outcome determinative here. To satisfy intermediate scrutiny under Renton, a law must be "designed to serve a substantial governmental interest and allow[] for reasonable alternative avenues of communication." Renton, 475 U.S. at 50; see also Club Madonna, 42 F.4th at 1244. As explained in Lady J. Lingerie, the latter requirement does not require a court to parse too finely, as that would cause the court to engage in a "line-drawing [exercise that] is inconsistent with a narrow tailoring requirement that only prohibits regulations that are 'substantially broader than necessary.'" 176 F.3d at 1365 (quoting Ward, 491 U.S. at 800).

Under Renton, the Court's conclusion is the same. The 2020 Ordinance serves the substantial interest of preventing human and sex trafficking and leaves open reasonable avenues of expression because it only regulates erotic dancing in the fora of adult entertainment establishments. Individuals between eighteen and twenty-years-old may still dance elsewhere. See, e.g., § 151.103(a) (defining "Dancing entertainment establishment" as "any establishment where during its hours of operation any worker wearing sexually provocative attire dances erotically and accepts any consideration, tip, remuneration or compensation from or on behalf of a customer. A dancing entertainment establishment shall not include any nightclub or restaurant where dancing entertainment establishment activities do not occur, theater, concert hall, art

Absent a constitutional violation, it is not the Court's role to stand in place of the City or to opine on whether the age restriction represents sound public policy. The City has presented sufficient support for its legislation by showing a link between its interest in combatting negative secondary effects and the age restriction, which furthers that interest. "[M]unicipalities must be given a reasonable opportunity to experiment with solutions to address the secondary effects of protected speech." City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 439 (2002) (plurality) (internal quotation marks omitted); see also Flanigan's Enterprises, 596 F.3d at 1279. Thus, the Court denies permanent injunctive relief to Plaintiffs as to Count IV in Wacko's I and Count II in Wacko's II.

### C.   Other Age Restriction Constitutional Challenges

Separately, Plaintiffs claim that the age restriction is constitutionally underinclusive because it applies only to performers rather than others at adult entertainment establishments (hosts, servers, managers, owners, patrons, etc.). (Doc. 1 ¶ 155 in 3:20-cv-303; Doc. 1 ¶ 104 in 3:22-cv-798). Claims of underinclusiveness under the First Amendment may raise "doubts about whether the government is in fact pursuing the interest it invokes, rather than

---

center, museum, or similar establishment that is primarily devoted to the arts or theatrical performances as defined in Section 150.103 (Definitions), Ordinance Code.") (emphasis added); see also § 150.103(c).

disfavoring a particular speaker or viewpoint." <u>Williams-Yulee v. Fla. Bar</u>, 575 U.S. 433, 448 (2015). Underinclusive regulations of speech may "represent a governmental attempt to give one side of a debatable public question an advantage in expressing its views to the people." <u>Celli v. City of St. Augustine</u>, 214 F. Supp. 2d 1255, 1260 (M.D. Fla. 2000) (quoting <u>City of Ladue v. Gilleo</u>, 512 U.S. 43, 51 (1994)). Importantly, however, municipalities "need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns." <u>Williams-Yulee</u>, 575 U.S. at 449.

Based on the record, the City could reasonably have concluded that other employees and patrons aged eighteen to twenty at adult entertainment establishments were not as vulnerable to the dangers of human and sex trafficking as performers ages eighteen to twenty. The choice to make the restriction apply to performers only does not raise doubts as to whether the City enacted the legislation to curtail human and sex trafficking. The City may rightfully focus on what it seems to have viewed as the "most pressing concern[]," that is, the safety of performers specifically. <u>Id.</u> Thus, that the age restriction only applies to performers is not constitutionally underinclusive. The Court therefore denies permanent injunctive relief as to Count VI in Wacko's I and Count II in Wacko's II on this ground.[14]

---

[14] Count VI of the Complaint in Wacko's I alleges that both the human trafficking course requirement and the age restriction are constitutionally

To the extent Plaintiffs also allege that the age restriction violates the Equal Protection Clause and their right to occupational liberty, the Court denies those claims too. Plaintiffs spend little time arguing that the age restriction violates the Equal Protection Clause and conceded during the non-jury trial on December 15, 2022 that if they did not prevail under the First Amendment, they would not prevail under the Equal Protection Clause either. (See e.g., Doc. 2 at 22 in 3:22-cv-798).

As for Plaintiffs' occupational liberty claim, when a professional licensure scheme regulates speech, claims arising therefrom transform from issues of occupational liberty to those of the First Amendment. See, e.g., Wollschlaeger v. Governor, 848 F.3d 1293, 1308–10 (11th Cir. 2017); Lowe v. Sec. & Exch. Comm'n, 472 U.S. 181, 230 (1985) (White, J., concurring) ("At some point, a measure is no longer a regulation of a profession but a regulation of speech or of the press; beyond that point, the statute must survive the level of scrutiny demanded by the First Amendment."). The parties principally argue that the 2020 and 2022 Ordinances regulate expressive conduct under the First Amendment. The Court agrees and has analyzed the restrictions under the required level of scrutiny. As the Court has held that the age restriction satisfies

_____

underinclusive. (Doc. 1 ¶ 155 in 3:20-cv-303). The Court denies relief in part as to Count VI as it pertains to the age restriction only. The human trafficking course requirement issue is moot. (See Doc. 90 ¶ 4 in 3:20-cv-303).

intermediate scrutiny, it too satisfies the rational basis test required for an occupational liberty claim. See Lowe, 472 U.S. at 228 (White, J. concurring) (citing Schware v. Board of Bar Examiners, 353 U.S. 232, 239 (1957)). Plaintiffs therefore are not entitled to relief on Count V in Wacko's II.

## III.   WACKO'S I — REMAINING COUNTS

The Court turns to remaining issues arising only in Wacko's I. All record citations in this section pertain to Case No. 3:20-cv-303 unless otherwise stated.

### A.   Count VII — Constitutionality of Performer Record Searches

In Count VII, Plaintiffs claim the 2020 Ordinance allows for warrantless inspections of Club Plaintiffs' performer records. (Doc. 1 ¶¶ 158–71). Sections 150.224(g) and 151.214(g) mandate that:

> The performer roster and the Work Identification Card file shall be made available to the Sheriff for inspection and/or copying upon request.

(Doc. 1-1 at 10, 18). The 2022 Ordinance amended the last sentence of these sections to state: "The performer roster and the Work Identification Card file shall be made available to the Sheriff for inspection and/or copying upon request, which shall only be made during normal business hours when the establishment is open to the public." (See Doc. 1-1 at 7, 14 in 3:22-cv-798) (amendment underlined). The Court addresses the inspection requirement in

§§ 150.224(g) and 151.214(g) as they currently exist under the 2022 Ordinance. See McGuire, 50 F.4th at 999.

The parties agree one case controls the outcome of this Count: the Eleventh Circuit's decision in Club Madonna, 42 F.4th 1231. (Docs. 90 ¶ 5, 92 ¶ 2). Club Madonna involved a similar records inspection requirement for adult entertainment establishments: "The documents . . . must be available for inspection by the city upon demand, and the nude dance establishment shall not refuse access to these documents for inspection by the city." 500 F. Supp. 3d 1304, 1309 (S.D. Fla. 2020). The district court upheld this requirement. Id. at 1313–16. On appeal, the Eleventh Circuit affirmed, finding that the inspection scheme satisfied the appropriate administrative-search test and complied with the Fourth Amendment. 42 F.4th at 1248–51. Further, the Eleventh Circuit: found that the adult entertainment industry is a "closely regulated" industry; that the "more relaxed" standard stated in New York v. Burger, 482 U.S. 691, 702 (1987) was appropriate; that curbing human trafficking is a substantial government interest; and that the warrantless inspections permitted by the ordinance served that interest. Id. at 1248–51. Finally, the Eleventh Circuit addressed the temporal concerns in the ordinance, which potentially permitted inspections at any time, by adopting a narrowing construction and "reading the Ordinance to restrict the City's power to invoke the Ordinance's warrantless-search provision to the hours when the Club's administrative staff is (or, during

regular business hours, should be) available to fulfill the City's request." Id. at 1252.

Sections 150.224(g) and 151.214(g) of the 2022 Ordinance are substantively identical to the inspection scheme in Club Madonna and aim to serve the same substantial government interest of preventing sex and human trafficking. Further, the 2022 Ordinance's amendment imposes the same temporal limitations as announced by the Eleventh Circuit in Club Madonna by requiring the Club Plaintiffs to make their records available to the Sheriff only during normal business hours when open to the public. (See Doc. 1-1 at 7, 14 in 3:22-cv-798). The inspection provisions contained in §§ 150.224(g) and 151.214(g) are thus constitutional for the same reasons stated in Club Madonna. Accordingly, the Court finds for the City as to Count VII.

### B. Counts IX and X — Constitutionality of Vicarious Liability in Penalty Provisions

In Counts IX and X, Plaintiffs challenge several provisions of Chapters 150 and 151 for unlawfully imposing criminal and civil liability on managers, owners, and others, for acts committed by their servants, agents, and employees. (Doc. 1 ¶¶ 188–216). In Lady J. Lingerie, the Eleventh Circuit addressed a prior version of some of these same provisions and identified the parameters for imposing vicarious liability. 176 F.3d at 1360–61. For civil liability to be imputed, an ordinance must require proof that a defendant bears

a "responsible relation" to the unlawful conduct. Id. at 1367. "A defendant is in a 'responsible relation' if he has the power to prevent violations from occurring." Id. (citing United States v. Park, 421 U.S. 658, 670–73 (1975)). But a "responsible relation" alone is insufficient if the criminal liability involves imprisonment. Id. To impose a criminal penalty "based on respondeat superior," the ordinance must require proof of personal blameworthiness. Id. "Personal blameworthiness can take two forms: unlawful act and unlawful intent," and due process "at least requires individualized proof of intent or act." Id. at 1367–68 (emphasis in original).

Plaintiffs focus on several provisions that impute both civil and criminal liability for the acts of third parties. Sections 150.509(a) and (b) require a manager to be on duty on the premises "at all times" and charge managers with responsibility "for all acts of all employees on the premises" and state that managers "shall be responsible for the acts of all escorts off the premise [sic] if those acts are within the scope of the authority of the escort or employee." Section 150.509(c) further states:

> (c)    Any manager convicted of violating this Chapter due to responsibility imposed pursuant to this Section shall be upon conviction punished as follows:
>
>> (1)    For the first five offenses, by a fine of not less than $150 nor more than $500, or by imprisonment up to ten days in jail;

>(2)    For the sixth and subsequent offenses, by a fine of not
>less than $250 nor more than $500 and by imprisonment or
>[sic] not less than ten nor more than 90 days.

Section 151.506, regulating bikini bars, shares the same substantive provisions.

Plaintiffs contend that §§ 150.509 and 151.506 impose vicarious liability in the forms of fines and incarceration without the necessary safeguards. The Court agrees as to incarceration. Neither section contains a requirement of "individualized proof of [an unlawful] intent or act," for imposing incarceration on a manager. Lady J. Lingerie, 176 F.3d at 1367–68 (emphasis omitted). Instead, both sections impute liability on a manager for the acts of an employee, no matter if the manager had any personal blameworthiness related to the employee's acts. Therefore, as the Eleventh Circuit found in Lady J. Lingerie when interpreting almost identical language that imposed liability on owners, here, the City may not use these sections to incarcerate managers.

The civil fine, however, can be salvaged. Both sections impose liability for the acts of employees on the premises and escorts off the premises only "if those acts are within the scope of the authority of the escort or employee." §§ 150.509(b), 151.506(b). Again, Lady J. Lingerie guides the Court. In interpreting an almost identical provision ascribing liability to owners for acts performed by employees within the "scope of authority under the owner," the Eleventh Circuit held such language meant an owner-defendant was only responsible for acts or omissions the owner had the power to prevent, and thus

satisfied the "responsible relation" requirement. Lady J. Lingerie, 176 F.3d at 1367. The Court likewise reads §§ 150.509 and 151.506 as imposing civil liability on managers only for acts and omissions the manager has the power to prevent. For this reason, the City possesses the authority to fine managers for violations committed by their employees within the manager's power to prevent. Further, under the same reasoning, §§ 150.510 and 151.507—which impose civil fines on owners as penalties—survive Plaintiffs' challenges, as both sections cabin an owner's vicarious liability only to those acts committed within the "scope of authority under the owner," and thus mean an owner-defendant is responsible only for acts or omissions the owner has the power to prevent.[15]

Plaintiffs' challenges to other penalty provisions succeed in part. Sections 150.606(g) and (h) create liability for owners and others for specific acts committed by third parties:

> (g)    It shall be unlawful for any person owning, maintaining, operating or leasing a commercial establishment regulated under this Part to suffer or permit any violation of subsections (a) through (f) of this Section.[16]

---

[15] Whether the owner or manager has the "power to prevent" would be the subject of proof at a judicial proceeding. See Lady J. Lingerie, 176 F.3d at 1367.

[16] Sections (a) through (f) of § 150.606 state:

(a)    It shall be unlawful for any person to engage in nude or seminude entertainment in any commercial establishment at which alcoholic beverages are, or are available to be, sold, dispensed, consumed, possessed or offered for sale or consumption

(h)    A violation of subsection (g) shall occur if the person subject to that subsection is observed witnessing the violation or is in such proximity to the violation that it may be assumed that the person

---

on the premises.

(b)    It shall be unlawful for any female person, while on the premises of a commercial establishment at which alcoholic beverages are, or are available to be, sold, dispensed, consumed, possessed or offered for sale or consumption on the premises, to expose to public view that area of the human female breast at or below the areola thereof or to employ any device or covering which is intended to give the appearance of or simulate such areas of the female breast as described herein.

(c)    It shall be unlawful for any person, while on the premises of a commercial establishment at which alcoholic beverages are, or are available to be, sold, dispensed, consumed, possessed or offered for sale or consumption on the premises, to expose to public view his or her genitals, pubic area, anus or anal cleft or cleavage or to employ any device or covering which is intended to give the appearance of or simulate the genitals, pubic area, anus or anal cleft or cleavage.

(d)    It shall be unlawful for any person owning, maintaining, operating or leasing any commercial establishment at which alcoholic beverages are, or are available to be, sold, dispensed, consumed, possessed or offered for sale or consumption on the premises to suffer or permit any person on the premises to engage in nude or seminude entertainment.

(e)    It shall be unlawful for any entertainer, performer or employee, while on the premises of a commercial establishment regulated under this Part, to dance in such a manner as to simulate sexual activity with any patron, spectator, employee or other person not employed therein.

(f)    It shall be unlawful for any entertainer, performer or employee, while on the premises of a commercial establishment regulated under this Part, to sit upon or straddle the leg, legs, lap or body of any patron, spectator or other person therein, or to engage in or simulate sexual activity while touching or being touched by such patron, spectator or other person.

must have seen the violation of subsections (a) through (f) or intentionally ignored the violation.

If a person violates § 150.606, § 150.609 prescribes both civil and criminal penalties:

> (a)     Any person who violates any Section of this Part shall be guilty of an offense punishable as set forth herein.
>
> (b)     The penalty for violation of this Part shall be:
>
>> (1)     A fine of not more than $500 and
>>
>> (2)     Imprisonment of not less than two days nor more than 30 days.

In short, §§ 150.606(g) and (h) impose vicarious liability on any person who owns, maintains, operates or leases an establishment and who suffers or permits any violation under subsections (a) through (f), which occurs when the person is: (1) observed witnessing the violation, (2) in such proximity that it may be assumed the person saw the violation, (3) or intentionally ignored the violation.

The proximity provision presents a problem. As established before, if a defendant faces incarceration, the law must require proof of a defendant's personal blameworthiness either in the form of an unlawful act or unlawful intent. See Lady J. Lingerie, 176 F.3d at 1367–68. The witness and intentional ignorance provisions satisfy this standard, as both either require the defendant to commit an act or possess intent. But the proximity provision does not, as it allows a defendant's closeness to a violation to stand in for an unlawful act or

41

intent. See id. As the proximity provision does not contain the appropriate proof requirement, it may not impose incarceration.

That said, the civil fine in § 150.609(b)(1) for violations of §§ 150.606(g) and (h) survives. Section 150.606(g) imputes liability to "any person owning, maintaining, operating or leasing a commercial establishment regulated under this Part," that "suffer[s] or permit[s]" any violation under subsections (a) through (f). The plain meaning of "suffer or permit" is "to allow" something to occur—here, to allow a certain violation to take place. See Suffer, Black's Law Dictionary (11th Ed. 2019) ("2. To allow or permit (an act, etc.)"); Permit, Black's Law Dictionary (11th Ed. 2019) ("1. To consent to formally; to allow (something) to happen, esp. by an official ruling, decision, or law"). Although Plaintiffs make much ado about the words "suffer or permit" as creating a negligence standard of liability, even their own proposed definitions support that "suffer or permit" mean "to allow" something to occur.[17] (See Doc. 92 at 9).

Taking the next logical step, for a person to allow something, the person must have authority to do so, or in the converse, the authority to prevent something. See Allow, Black's Law Dictionary (11th Ed. 2019) ("1. To put no obstacle in the way of; to suffer to exist or occur; to tolerate <she allowed the

---

[17] Plaintiffs propose that "suffer" means to allowing something "by reason of indifference," whereas "permit" means to "allow something" more generally. Id.

neighbor's children to play on her lawn> . . . 2. To give consent to; to approve <the appellate court allowed the writ of error>. . . 9. To grant permission; to permit <to allow each student one absence>."). Although Plaintiffs advance a reading of these provisions as extending vicarious liability to those who do not have a responsible relationship, such as landlords, janitors, and maintenance technicians, the terms "suffer and permit" limit liability only to those who have the power to allow or prevent something from occurring. Section 151.609(b)(1) therefore requires a responsible relationship between the defendant and the culpable third party and the civil fine provision can remain intact. See Lady J. Lingerie, 176 F.3d at 1367 (there is "a 'responsible relation' if [a defendant] has the power to prevent violations from occurring.").

Plaintiffs also challenge similar, though not identical, provisions under Chapter 151 regulating bikini bars. (Doc. 1 ¶¶ 205–16). Sections 151.410, 151.501, 151.502, like § 150.606, list a series of violations, some of which impose vicarious liability on "any person who" acquiesces, allows, suffers, or permits certain violations. §§ 151.410(e), 151.501(a)(1), (2), (6), (8) and (10). Liable persons face a civil fine and incarceration under § 151.501(b). As with Chapter 150, incarceration is unavailable. Nothing in § 151.501 requires proof of personal blameworthiness. Therefore, § 151.501(b)(2) violates due process.[18]

_____

[18] The City argues that the provisions in Chapter 151 "mirror" the penalty provisions in Chapter 150 "in all meaningful respects," and make no

But also like Chapter 150, the civil penalties pass muster. The Court reads each provision as requiring the City to prove by a preponderance of the evidence a responsible relationship between the defendant and the culpable third party who commits the violation. If the City satisfies this burden, it may impose a civil penalty, which an accused party could contest in court. See Lady J. Lingerie, 176 F.3d at 1367–68.

Therefore, the Court finds in favor for the Plaintiffs in part as to Counts IX and X. In short, the Court finds unconstitutional §§ 150.509(c) and 151.506(c) (incarceration penalties for managers), 150.606(h) and 150.609(b)(2) (proximity provision and corresponding incarceration penalty), and 151.501(b)(2) (incarceration penalty).

## C.   Count XII — Conflicting Penalty Provisions

Plaintiffs also argue that certain penalty provisions of Chapters 150 and 151 conflict and thus are unconstitutionally vague. (Doc. 92 at 17). They specifically challenge §§ 150.224(n), 150.606(g) and (h), 150.509, 150.510, 150.609, 151.214(n), 151.501(b) and 151.502(b). Id. Vagueness challenges commonly involve imprecise terms or clauses that fail to provide fair notice of prohibited conduct to ordinary people. City of Chicago v. Morales, 527 U.S. 41,

---

distinct arguments with respect to Chapter 151. (Doc. 95 at 6). As the City contends the provisions are the same for the purposes of this analysis, the Court declines to treat them differently.

56 (1999). The doctrine also extends to laws that "authorize or even encourage arbitrary and discriminatory enforcement." <u>Id.</u> (citing <u>Kolender v. Lawson</u>, 461 U.S. 352, 357 (1983)). "An unconstitutionally vague law invites arbitrary enforcement in this sense if it 'leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case . . . .'" <u>Beckles v. United States</u>, 580 U.S. 256, 266 (2017) (quoting <u>Giaccio v. Pennsylvania</u>, 382 U.S. 399, 402–03 (1966)). Sentencing provisions also may be unconstitutionally vague if they do not state with sufficient clarity the consequences of violating a given criminal statute. <u>See</u> <u>Giaccio</u>, 382 U.S. at 402–04 ("Implicit in this constitutional safeguard is the premise that the law must be one that carries an understandable meaning with legal standards that courts must enforce."); <u>United States v. Batchelder</u>, 442 U.S. 114, 123 (1979) ("It is a fundamental tenet of due process that no one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes.") (internal citation and quotation marks omitted).

Except for § 150.224(n), the challenged penalty provisions under Chapter 150 are vague. The Court uses an example of a manager of a juice bar to illustrate. Chapter 150 regulates juice bars and requires a manager to always be on duty on the premises during operation and imposes vicarious liability for the acts of employees, as discussed in Section III.B. § 150.509 (a), (b). Thus, a manager faces a civil fine "not less than $150 nor more than $500," or a criminal

45

penalty of "imprisonment up to ten days in jail" for the first five offenses. § 150.509(c)(1). Then, for the sixth and any subsequent offense, a manager faces a civil fine "not less than $250 nor more than $500" and a criminal penalty of "imprisonment of not less than ten nor more than 90 days."[19] § 150.509(c)(2). But under a separate Part of Chapter 150, §§ 150.606 and 150.609 impose vicarious liability on managers for specific violations by others, such as "straddle" dancing while touching a patron under § 150.606(f), and managers face a "fine of not more than $500 and [] imprisonment not less than two days nor more than 30 days[,]" regardless of the number of prior offenses. See §§ 150.606(f), (g), (h); 150.609. So if an on-duty manager is vicariously liable for a single act that violates both §§ 150.509 and 150.606, it is unclear whether both penalty provisions—which prescribe different ranges for fines and different lengths of incarceration—apply or if they apply alternatively to one another. Cf. Batchelder, 442 U.S. at 125–1226 (finding statutes that provided alternative punishments for the same conduct not vague). This same uncertainty infects §§ 150.510 and 150.609 to the extent they govern owners and likewise impose different penalties.[20]

---

[19] In addressing Count IX, the Court found the incarceration penalty in § 150.509 unlawful. Supra, Section III.B. The Court also found the proximity provision did not permit incarceration under §§ 150.606(h) and 150.609. Id. Nevertheless, the Court describes both penalties here to illustrate the conflict between the different penalty provisions managers may face.

[20] Under § 150.510, the owner faces a fine no more than $500, no matter

The City provides no reading to reconcile these provisions. See Giaccio, 382 U.S. at 402–04. Thus, the penalty provisions are void for vagueness, as a manager or owner would not know which penalties apply, and in the case of owners, when they face criminal punishment. See City of Chicago, 527 U.S. at 56. The provisions also provide no clear guideline for enforcement. Id. Therefore, the penalty provisions in §§ 150.509, 150.510, and 150.609 are unconstitutionally vague.

However, the Court is less convinced that the provisions challenged in Chapter 151 are vague. Section 151.501(b) provides that "for any violation of this Chapter" a person shall draw a fine of "not more than $500[] and imprisonment of not more than 30 days."[21] Section 151.502 then allows the enforcement body to impose specific civil fines for certain violations "[i]n addition to or in lieu of the penalties that may be imposed under Section 151.501[.]" Unlike the provisions in Chapter 150 that impose multiple conflicting penalties for the same violation, here, the provisions identify that certain enumerated violations in § 151.502 may incur an additional fine or a fine in lieu of the penalties in §151.501(b). In other words, a manager or owner

_____

how many offenses. Yet, under §§ 150.606 and 150.609, an owner may be subject to a fine and imprisonment. Like with the provisions concerning managers, the issue here is which penalty applies.

[21] However, the Court found the incarceration provision in § 151.501(b) unlawful when resolving Count X. See supra, Section III.B.

knows that, at a minimum, they face the penalties in § 151.501(b), and may face a greater fine or different penalty for specific acts under § 151.502. Fair notice is satisfied. See Batchelder, 442 U.S. at 120–122.[22] And although Plaintiffs claim that these provisions lack "standards to guide" the enforcement of Chapter 151, (Doc. 1 ¶ 240), Plaintiffs do not argue in their briefing nor cite any cases supporting this contention. So, the Court rejects this challenge to §§ 151.501 and 151.502. Likewise, although Plaintiffs challenge §§ 150.224(n) and 151.214(n) in Count XII of their Complaint, they only glancingly reference these sections in their briefing and do not meaningfully argue the point. (See Docs. 1 ¶¶ 241–42, 92 at 17). Therefore, these arguments are waived. See Flanigan's Enters., Inc. v. Fulton County, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (holding that a party waives an argument if the party "fail[s] to elaborate or provide any citation of authority in support" of the argument) (superseded on other grounds).

Therefore, the Court finds for Plaintiffs in part as to Count XII. The penalty provisions in §§ 150.509, 150.510, and 150.609 are vague to the extent they conflict with one another and do not provide reasonable notice of what penalty provisions apply.

---

[22] Nevertheless, if the City chooses to redraft these Chapters it may want to consider one clear set of penalties for vicarious liability.

**D.** **Counts XXVI — <u>Ultra Vires</u> Challenge to Chapters 150 and 151**

In Count XXVI, Plaintiffs seek a declaratory judgment that §§ 150.224 and 151.214 are <u>ultra vires</u> and unauthorized by Florida law. (Doc. 1 ¶ 530). Plaintiffs focus on the penalty provision in subsection (b) of each section:

> (b) <u>Penalty</u>. Any performer, license holder, owner, operator or manager who violates or knowingly permits a violation of this section shall be guilty of a misdemeanor of the second degree.

<u>Id.</u> at ¶ 531; <u>see also</u> Doc. 1-1 at 8, 16. The imposition of a misdemeanor, Plaintiffs argue, exceeds the City's authority because municipal ordinances cannot give rise to misdemeanor offenses under Florida law. (Doc. 92 at 21–23).

But the Court need not reach this issue because when the City passed the 2022 Ordinance, it amended §§ 150.224(b) and 151.214(b) and removed the misdemeanor language. (<u>See</u> Doc. 1-1 at 2–3, 10 in 3:22-cv-798). The City revised the subsections to state that the violations "shall be a civil infraction," and would result in a "civil penalty of $200." <u>Id.</u> Thus, the portion of the 2020 Ordinance Plaintiffs dispute is no longer in effect. There is no suggestion that the City intends to reinstate this penalty provision. <u>Cf.</u> <u>Coral Springs St. Sys., Inc. v. City of Sunrise</u>, 371 F.3d 1320, 1331 (11th Cir. 2004) ("Whether the repeal of a law will lead to a finding that the challenge to the law is moot depends most significantly on whether the court is sufficiently convinced that

49

the repealed law will not be brought back."). As the City amended Chapters 150 and 151 amidst this litigation, including after this Court assessed the constitutionality of portions of those Chapters, it seems likely the City amended these provisions in an attempt to ameliorate constitutional challenges, not to temporarily change the penalty provision. Plaintiffs' challenge is moot. <u>See</u> <u>McGuire</u>, 50 F.4th at 999; <u>Jews for Jesus, Inc.</u>, 162 F.3d at 629. As a result, the Court denies as moot relief to Plaintiffs as to Count XXVI.

### E. Counts XXVII — Preemption Challenge to Imprisonment Term Requirement in § 150.609(b)(2)

Plaintiffs allege that the mandatory imprisonment term set forth in § 150.609(b)(2) is preempted by state law. (Doc. 1 at ¶¶ 537–43). However, the Court need not reach this matter as the Court struck § 150.609(b)(2) under Count XII. <u>Supra</u>, Section III.C. Therefore, Count XXVII is moot.[23]

## IV. WACKO'S II — REMAINING COUNTS

The Court turns to the counts remaining in Wacko's II. All docket citations in this section pertain to Case No. 3:22-cv-798 unless otherwise stated.

### A. Count I — Constitutionality of Performer Licensing Scheme

In Count I, Plaintiffs claim that licensing provisions in the 2022 Ordinance impose an unconstitutional prior restraint on First Amendment

---

[23] However, the City may want to revisit the mandatory minimum penalty if it seeks to redraft this section of the Code.

protected speech. (Doc. 1 ¶¶ 87–96). Section 150.224(a) of the 2022 Ordinance, which regulates Sinsations, states:

> (a) <u>Performer Work Identification Card required</u>. Any person desiring to perform in an adult entertainment establishment licensed under this Chapter must obtain a Work Identification Card from the Sheriff. No person shall act as a performer in an adult entertainment establishment without having previously obtained said Work Identification Card, except as permitted during the Grace Period as set forth in this section. Additionally, no license holder or establishment manager shall employ, contract with or otherwise allow any performer to perform in an adult entertainment establishment who does not possess a valid and effective Work Identification Card except as permitted during the Grace Period as set forth in this section. Establishment managers shall be required to review all Performer Rosters at the commencement of his or her shift to verify compliance with this section.

(Doc. 1-1 at 2). Section 151.214(a) imposes the same requirement on bikini bars. <u>Id.</u> at 10. These sections remain largely unchanged from the 2020 Ordinance except for adding the final sentence. <u>Id.</u> at 2, 10.

Plaintiffs assert that the licensing scheme is an unconstitutional prior restraint because it "does not include all of the substantive and procedural guarantees required by the First Amendment," and carries over the same defects from the 2020 Ordinance. (Doc. 2 at 2, 10–11). They argue the 2022 Ordinance still gives the Sheriff unbridled discretion in approving or denying application for Work Identification Cards, provides an unreasonably long time for application decisions (fourteen days), fails to preserve the status quo during the application period and appeal process, and provides an improper appellate

51

remedy. Id. at 10–19. Unsurprisingly, the City disagrees and counters each challenge. (Doc. 24 at 1–9).

The Court determined before that the 2020 Ordinance's licensing scheme was a prior restraint on First Amendment speech. Wacko's Too, 522 F. Supp. 3d at 1145–47. As the 2022 Ordinance involves an amended version of the licensing scheme, it too operates as a prior restraint. See Am. Entertainers, 888 F.3d at 720. ("Licensing schemes preclude expression until certain requirements are met, and therefore are prior restraints.") (citation omitted). A law that "subject[s] the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150–51 (1969). Such laws are problematic because they "make[] the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official." Id. at 151. Without procedural safeguards, these laws impose unlawful prerequisites to First Amendment activity. Id. Thus, "[a]ny system of prior restraints of expression" bears "a heavy presumption against its constitutional validity." Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70 (1963); see also FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 225 (1990).

"As a form of prior restraint, licensing schemes commonly contain two defects: discretion and the opportunity for delay." Lady J. Lingerie, 176 F.3d at 1361. First, "[a]n ordinance that gives public officials the power to decide whether to permit expressive activity must contain precise and objective criteria on which they must make their decisions; an ordinance that gives too much discretion to public officials is invalid." Id.; see also Fly Fish, 337 F.3d at 1313 (quoting Lady J. Lingerie and reiterating the reasons for which the Eleventh Circuit has declared many prior restraints unconstitutional). Second, license applications must be decided in a timely manner. "An ordinance that permits public officials to effectively deny an application by sitting on it indefinitely is also invalid." Lady J. Lingerie, 176 F.3d at 1361–62 (citing Freedman v. Maryland, 380 U.S. 51 (1965)). This Court held that the 2020 Ordinance contained "both defects" of discretion and delay. See Wacko's Too, 522 F. Supp. 3d at 1145 (citing Lady J. Lingerie, 176 F.3d at 1362). The 2022 Ordinance no longer contains a defect of delay, but it does contain a defect of unbridled discretion.

    i.   The licensing scheme improperly vests unbridled discretion in the Sheriff to decide license applications.

Sections of the 2022 Ordinance regarding the license application and issuance process state:

(c) Application for Work Identification Card. An application for a Work Identification Card shall be obtained from the Sheriff. The

application shall include: the applicant's full legal name (including maiden name, if applicable); residential address; driver's license number or government issued identification or passport number; date of birth; natural hair and eye color; race; sex; height and weight; place of birth (city, state or country); telephone number; email address; a list of locations of and descriptions of any tattoos; confirmation that the applicant has not been convicted within the relevant periods of time of any violation listed in subparagraph (l), and a list of each [adult or dancing] entertainment establishment where the applicant will be performing and each stage name used by the applicant at each location.

Each applicant shall affirm through either attestation on the application or presentation of a certificate of completion to the Sheriff that he or she has completed one, free-of-charge, sex trafficking education program presented by the Polaris Project (https://polarisproject.org/training/) (approximately 45 min. in length) or the U.S. Department of Homeland Security, Blue Campaign Consequences Training (https://www.dhs.gov/blue-campaign/course_consequences_p01) (approximately 15 min. in length). The Sheriff shall maintain and make available to any applicant each sex trafficking education program in the event any applicant does not have online access to the program(s).

Additionally, the applicant shall affirm that he or she understands that the Work Identification Card may be immediately revoked if issuance of the card is made illegal through order of any court. The application shall be in writing, signed and notarized, fully completed and submitted to the Sheriff together with the nonrefundable application fee. Each applicant must submit proof of identity at the time the application is submitted. . . . No Work Identification Card shall be issued to an applicant who has been convicted of human trafficking or any human trafficking-related charge or who is currently on suspension for any violation listed under subsection (l), below. Work Identification Cards are valid for a term of one year. Applicants are required to update his or her application with changes to any of the application information (except height and weight) within 60 days of the change of such information.

All current performers shall complete and submit an application for a Work Identification Card within ninety (90) days from the

effective date of this section (the "Grace Period"). Upon conclusion of the Grace Period, no performer shall be permitted to perform until a current Work Identification Card is obtained or without a valid copy of the application fee payment check or receipt as specified in subparagraph (e), below.

. . . .

(f) <u>Issuance of Work Identification Card.</u> The Sheriff is responsible for verifying all information contained on a Work Identification Card application. The Sheriff shall approve or deny an application within fourteen (14) days of receipt of a completed application and payment of the applicable fee. If the Sheriff fails to approve or deny an application within the 14-day time limit, the application shall be deemed granted and the applicant can continue to rely on his or her receipt or check copy as a substitute for the Work Identification Card to legally perform or can request the Sheriff to issue an official card. An issued Work Identification Card shall include the performer's name, photograph, date of birth, height, weight, natural eye and hair color, and a unique card number. Should the Sheriff determine that the proof submitted with the application for the Work Identification Card as required hereinabove is not satisfactory or full payment of the application fee is not received, the Sheriff shall deny issuance of said Work Identification Card and shall provide written notification to the applicant stating the reason(s) for any such denial.

§§ 150.224(c), (f), 151.214(c), (f); (Doc. 1-1 at 3–6, 10–14).

Plaintiffs raise two challenges to the Sheriff's discretion in deciding license applications. One succeeds. As part of the application criteria, the Sheriff shall not issue a Work Identification Card to any applicant convicted of human trafficking, any specific offense listed in subsection (1),[24] or any "human

---

[24] Sections 150.224(l) and 151.214(l) state: "For any performer convicted of the following violations either while performing at or while present in any [adult or dancing] entertainment establishment, the performer's Work Identification Card shall be suspended as follows:

i.      Five years for prostitution;

trafficking-related charge." §§ 150.224(c), 151.214(c); (Doc. 1-1 at 4, 12). The final criterion creates concern, as it vests the Sheriff with discretion to determine which crimes disqualify an application under the undefined term "human trafficking-related charge."

Courts have stuck down similar laws that granted licensors discretion to determine which laws relate to a licensee's application. In <u>Miami Herald Pub. Co. v. City of Hallandale</u>, 734 F.2d 666, 673–75 (11th Cir. 1984), the Eleventh Circuit considered a city ordinance that vested city officials discretion to determine whether a license applicant had complied with "applicable ordinances" before receiving a license to vend newspapers. The Eleventh Circuit held this provision afforded city officials too much discretion, as the ordinance called on them "to apply the specific facts surrounding a given applicant's case to the general body of law contained in the city code, to determine if the applicant ha[d] violated a provision therein, and if so to deny him the right to do business." <u>Id.</u> at 675. The city officials therefore performed "an adjudicative function" rather than a ministerial one, which "necessarily "involve[d] the

---

  ii.  Three years for forcible felonies;

  iii.  Three years for narcotic sales or drug trafficking;

  iv.  One year for lewd/obscene acts; and

  iv.  One year for possession of narcotics or narcotics paraphernalia . . ."

exercise of considerable discretion" and could allow the city officials to discriminate against licensees. Id.

Similarly, in Fly Fish, the Eleventh Circuit considered an ordinance that allowed city officials to determine whether granting a license application "would violate either a statute or ordinance or an order from a Court of law that effectively prohibit[ed] the applicant from obtaining an adult entertainment establishment license, or if the applicant fail[ed] to comply with Florida law regarding corporations, partnerships, or fictitious names." 337 F.3d at 1312–13 (internal quotation marks omitted). The Court reasoned that the ordinance "exceed[ed] the limits of permissible ministerial discretion" by allowing city officials "to decide which statutes or ordinances apply, whether the applicant has violated those laws, and whether they effectively prohibit the applicant from obtaining a license." Id. at 1313 (internal quotation marks omitted).

Following Fly Fish, a district court in XXX Group, Inc. v. City of Lauderhill, analyzed the constitutionality of a zoning licensing scheme for adult entertainment establishments. No. 06-60331-CIV-LENARD/TORRES, 2008 WL 11401782, at *6 (S.D. Fla. June 27, 2008). There, following the Fly Fish court's reasoning, the district court found that the licensor-agency possessed unchecked discretion because it could deny a license application if it determined a proposed establishment would violate "a provision of this Code or any building, fire, or zoning code, statute, ordinance or regulation." Id. This

57

application criteria did not constitute a "narrow, objective, and definite standard," to guide the agency officials in their licensure review, and thus rendered the law an invalid prior restraint. Id. at *5–6 (citing CAMP Legal Def. Fund, Inc. v. City of Atlanta, 451 F.3d 1257, 1279 (11th Cir. 2006)).

The 2022 Ordinance's requirement that the Sheriff determine whether the applicant has been convicted of a "human trafficking-related charge" resembles the provisions that courts found unconstitutional in Miami Herald, Fly Fish, and XXX Group where government officials were given the authority to decide which laws related to a licensee's application. Though the Sheriff's discretion here is somewhat constrained by requiring that any crimes be tied to human trafficking, this nevertheless falls short of the requisite "narrow, objective, and definite standard to guide" the Sheriff. Shuttlesworth, 394 U.S. at 150–51. Indeed, the Ordinance lists other specific disqualifying crimes, including human trafficking and those enumerated in subsection (l). §§ 150.224(c), 151.214(c); (Doc. 1-1 at 4, 12). But it does not list specific crimes that relate to human trafficking to guide the Sheriff, nor otherwise cabin the Sheriff's discretion. Thus, to make such a determination, the Sheriff must perform an "adjudicative function" by assessing the applicant's criminal history, the nature, facts, or circumstances of an applicant's prior convictions, and then determine whether the applicant violated a law "related" to human trafficking. Miami Herald, 734 F.2d at 675. The outcomes may vary among

Sheriffs because no objective standard exists, like a list of specific crimes that are human trafficking-related. The Sheriff's discretion thus exceeds the ministerial and §§ 150.224(c) and 151.214(c) are unconstitutional prior restraints. See Lady J. Lingerie, 176 F.3d at 1362.

However, Plaintiffs' other challenge to the Sheriff's discretion fails. Plaintiffs argue the Sheriff's authority to find proof submitted with an application "not satisfactory" affords excessive discretion. Sections 150.224(c) and 151.214(c) list the application criteria and proof required upon submission, including: (1) the applicant's biographical and contact information (the specifics are listed in subsection (c)); (2) the applicant's attestation of having no criminal convictions for certain crimes; (3) where the applicant will perform and each stage name used at each location; (4) the applicant's completion of a sex trafficking education course or presentation of a certificate of completion; (5) proof of identity; and (6) the application fee. (Doc. 1-1 at 3–4, 10–12). Sections 150.224(f) and 151.214(f) state that "the Sheriff is responsible for verifying" the application information and may determine that the "proof submitted with the application . . . as required hereinabove is not satisfactory or full payment of the application fee is not received." Id. at 5–6, 13.

On its face, this process does not require the Sheriff to exercise anything but ministerial discretion. See Lady J. Lingerie, 176 F.3d at 1362. As written, the 2022 Ordinance only permits the Sheriff to "verify" the application

information, confirm the applicant paid the fee, and determine whether the applicant submitted "satisfactory" "proof" of the information listed in subsection (c). A similar licensing procedure was characterized as ministerial in FW/PBS, 493 U.S. at 229. In FW/PBS, the Supreme Court held that a licensor reviewing "the general qualifications of each license applicant" constituted "a ministerial action that is not presumptively invalid." Id. at 229. The 2022 Ordinance similarly tasks the Sheriff with the administrative function of assessing the completeness of the materials submitted with the application. Unlike the 2020 Ordinance, the Sheriff may no longer consider "whatever he or she deems relevant" on the application, which the Court found unconstitutional in Wacko's I. See Wacko's Too, 522 F. Supp. 3d at 1146. Now, the 2022 Ordinance identifies specific criteria the Sheriff must verify and the proof each applicant must submit, which means the Sheriff cannot consider additional criteria not identified in the 2022 Ordinance. Indeed, "some measure of discretion is acceptable," and in this particular provision, the Sheriff's discretion is properly constrained. Lady J. Lingerie, 176 F.3d at 1362. Thus, on their face, §§ 150.224(f) and 151.214(f) are constitutional, subject to an as-applied challenge made to the Sheriff's exercise of ministerial duty in a given individual case.

ii.     The licensing scheme is not defective for delay.

Plaintiffs also challenge the time constraint on the Sheriff's decision. The licensing scheme requires the Sheriff to approve or deny an application within fourteen days of receiving it, and if the Sheriff fails to do so within that time, the application shall be deemed granted. §§ 150.224(f), 151.214(f); (Doc. 1-1 5–6, 13–14). A permissible prior restraint requires a time limit on when the decisionmaker must issue the license. FW/PBS, 493 U.S. at 226; see also Vance v. Universal Amusement Co., 445 U.S. 308, 316 (1980). "A scheme that fails to set reasonable time limits on the decisionmaker creates the risk of indefinitely suppressing permissible speech." FW/PBS, 493 U.S. at 227 (emphasis added); see also Riley v. Nat'l Fed'n of Blind of N.C., Inc., 487 U.S. 781, 802 (1988) ("[D]elay compels the speaker's silence."). Previously, this Court held that the City's scheme in the 2020 Ordinance lacked the requisite time constraint because it gave no deadline for the Sheriff's licensing decision. See Wacko's Too, 522 F. Supp. 3d at 1147. Now, under the 2022 Ordinance, the City's scheme provides a specific, restricted time limit by which the Sheriff must render a decision and allows applicants to perform if the Sheriff fails to make a timely decision. Thus, there is no longer a concern of "indefinite postponement of the issuance of a license." FW/PBS, 493 U.S. at 227.

Plaintiffs object to the length of the time limit—fourteen days. But the Eleventh Circuit has found time constraints longer than fourteen days

61

reasonable. See, e.g., Café Erotica of Fla., Inc. v. St. Johns Cnty., 360 F.3d 1274, 1282–83 (11th Cir. 2004) (finding thirty-day period for permit approval constitutional because the decisionmaker could not "delay the permitting process indefinitely," though the ordinance was ultimately unconstitutional for unbridled discretion); Redner, 29 F.3d at 1500 (holding that a forty-five-day restraint was reasonable and expressing agreement with other federal courts that have found time periods as long as ninety days to be reasonable). However, Plaintiffs rely on Kev, Inc. v. Kitsap Cnty., 793 F.2d 1053, 1060 (9th Cir. 1986), where the Ninth Circuit held that a five-day period between a performer's filing of an application and a county's license decision unconstitutional, particularly as the ordinance prevented performers from dancing during the five-day period.

Although Kev is persuasive, the licensing scheme here does not contain the same risk for undue delay because applicants may perform without an "official" Work Identification Card issued by the Sheriff while their applications are pending or in the event the Sheriff fails to decide an application timely. Sections 150.224(e) and 151.214(e) state that "[a] copy of the check, or of a receipt issued by the Sheriff, showing payment for an application . . . shall allow the applicant to perform pending receipt of the official Work Identification Card." (Doc. 1-1 at 5, 13). Thus, applicants may use a check copy or receipt from the Sheriff as a substitute license to perform during their applications' pendency. Plaintiffs claim an inconsistency exists between these provisions and

others in the Ordinance related to the adult entertainment establishments'
obligations. (Doc. 2 at 15–16). They argue the establishments may only employ
performers who have been issued an "actual Work Identification Card" because
subsection (a) requires establishments to retain performers who possess "valid
and effective" Cards and subsection (g) requires establishments to maintain a
"legible photocopy of the Work Identification Card" on file. §§ 150.224(a), (g),
151.214(a), (g); (Doc. 1-1 at 2, 6–7, 10, 14).

But this position belies the plain reading of the 2022 Ordinance. "As with
any statutory interpretation question, [the] analysis 'must begin, and usually
ends, with the text of the statute.'" United States v. Stevens, 997 F.3d 1307,
1314 (11th Cir. 2021) (citation omitted). The Court need not go beyond the text
of the Ordinance as no internal inconsistency exists. Facially, the Ordinance
contemplates that Work Identification Cards can take multiple forms. The Card
may be an "official" one issued by the Sheriff that contains the information
about the performer identified in §§ 150.224(f) and 151.214(f). (Doc. 1-1 at 5–6,
13). Or an applicant's check copy or receipt may serve as a temporary Card
"pending receipt of the official Work Identification Card" under §§ 150.224(e)
and 151.214(e). Id. at 5, 13. Further, the Ordinance allows an applicant to use
the "receipt or check copy as a substitute for the [Card] to legally perform" if the
Sheriff fails to act timely. Id. at 5–6, 13. Sections 150.224(a) and (g) and
151.214(a) and (g), pertaining to the establishments' obligations, do not require

the establishments to document an "official" Card issued by the Sheriff; instead, they require establishments to only employ performers who have a "valid and effective" Card and to keep a photocopy of the Card on file. (Doc. 1-1 at 2, 6–7, 10, 14). As check copies and receipts may serve as valid and effective Cards in certain circumstances, nothing in the Ordinance prohibits establishments from retaining performers with those check copies or receipts and photocopying them as records of substitute Cards. (The "official" Card can then be provided when available.) The text of the Ordinance reveals no doubt that performers may perform during an application's pendency or if the Sheriff fails to act timely.

Even if Plaintiffs advance a competing plausible reading of the Ordinance, the constitutional avoidance canon still "provides that [a] statute should be interpreted in a way that avoids placing its constitutionality in doubt.'" Club Madonna Inc., 42 F.4th at 1252 (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 247 (2012)). "The Supreme Court has explained that this canon 'is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts.'" Id. (citing Clark v. Martinez, 543 U.S. 371, 381 (2005)). Applying this canon, the Court's reading avoids the purported inconsistency Plaintiffs argue and permits applicants to perform during the pendency of their application periods using allowed documents as a substitute

Card without violating any of the establishment's obligations and record-keeping requirements.

As the Ordinance allows applicants to exercise their First Amendment rights while an application is pending and the licensing decision on an application must be made within the specific, limited time of fourteen days, the licensing scheme does not create undue delay. See FW/PBS, 493 U.S. at 226. Therefore, the fourteen-day period is permissible.

     iii.    The 2022 Ordinance preserves the status quo as constitutionally required and provides an appropriate appellate remedy.

Relatedly, Plaintiffs argue the licensing scheme fails to preserve the status quo if an applicant appeals the Sheriff's decision. (Docs. 2 at 11–12, 17–18, 25 at 3, 6). As support, they point to the Supreme Court's decisions in Freedman and FW/PBS. The Supreme Court in Freedman outlined three procedural safeguards that a prior restraint on protected expression must contain: (1) the burden of going to court to suppress the speech must rest with the government; (2) any restraint prior to a judicial determination may only be for a specified brief time to preserve the status quo; and (3) an avenue for prompt judicial review of the decision must be available. See Freedman, 380 U.S. at 58–59; see also Cannabis Action Network, Inc. v. City of Gainesville, 231 F.3d 761, 772 (11th Cir. 2000) (judgment vacated on other grounds) (describing the three procedural requirements set out in Freedman).

Later, in FW/PBS, a majority of the Supreme Court agreed that the latter two safeguards are "essential," while a three-judge plurality held that the first procedural safeguard may not be required in certain limited circumstances. 493 U.S. at 229–30; see also Ward v. County of Orange, 217 F.3d 1350 (11th Cir. 2000) ("[T]he [FW/PBS] plurality concluded a licensing scheme must provide the second and third safeguards required by Freedman . . . [and] that the first procedural safeguard from Freedman did not apply in the licensing context."); Redner, 29 F.3d at 1500 (11th Cir. 1994) ("In FW/PBS, therefore, six Justices agreed that a licensing ordinance, such as the one in question here, must contain, at a minimum, the latter two procedural safeguards from Freedman: specified brief time limits on the decisionmaker and prompt judicial review.").

Although Plaintiffs contend that the second safeguard requires the status quo be maintained until judicial resolution, courts have instead applied this safeguard as requiring a specific time limit on the initial licensing decision. See e.g., FW/PBBS, 493 U.S. at 229–30 (holding content-neutral licensing scheme was an unconstitutional prior restraint because it violated the second Freedman safeguard as it lacked adequate limits on the time by which the decisionmaker had to issue or deny the license); Solantic, LLC v. City of Neptune Beach, 410 F.3d 1250, 1270 (11th Cir. 2005) (explaining that Freedman requires "strict time limits for licensing decisions" and striking code provision that lacked any time limit for permitting decisions); Lady J. Lingerie,

176 F.3d at 1363 (striking down a requirement that adult businesses obtain a zoning exemption because the ordinance did not "require a deadline for [the zoning board's]" decision.); United States v. Frandsen, 212 F.3d 1231, 1238–40 (11th Cir. 2000) (holding that regulation did not contain proper safeguards when it failed to "confine the time within which the decision maker must act.") (citation omitted); Café Erotica, 360 F.3d at 1282–83 (finding that a law satisfied the second and third safeguards under FW/PBS and Freedman because the law prescribed a specific deadline for the licensor to render a decision and allowed an applicant to appeal a license denial within thirty days).

Simply put, "[i]n FW/PBS, the Supreme Court explained that the second Freedman requirement—any restraint prior to a judicial determination may only be for a specified brief time period in order to preserve the status quo—means that 'the licensor must make the decision whether to issue the license within a specified and reasonable time period during which the status quo is maintained . . . .'" Frandsen, 212 F.3d at 1238–39 (citation and alteration omitted). Although Plaintiffs argue that the City must uphold the status quo for performers during the appeal process until a judge rules on the Sheriff's licensing decision, this is not required by Freedman or its progeny. The 2022 Ordinance's prohibition against an applicant performing after the Sheriff denies the application is constitutional.

The licensing scheme also satisfies the third <u>Freedman</u> safeguard by providing an avenue for prompt judicial review. If the Sheriff denies an application, the Ordinance states that the applicant <u>may</u> appeal the decision by requesting emergency injunctive relief in the local circuit court. §§ 150.224(h), 151.214(h) (Doc. 1-1 at 7, 14). The text reads:

> (h) <u>Appeal.</u> In the event that an applicant for a Work Identification Card is denied, said applicant may request emergency injunctive relief from the Circuit Court of the Fourth Judicial Circuit of the State of Florida.

<u>Id.</u>

"[O]nly a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression . . . ." <u>Freedman</u>, 380 U.S. at 58. An avenue of plenary review and prompt judicial decision making are necessary if an application is denied. <u>City of Littleton v. Z.J. Gifts D-4, L.L.C.</u>, 541 U.S. 774, 779–81 (2004) (analyzing <u>FW/PBS</u> and emphasizing that judicial review prevents undue delay and must be prompt in adult business licensing schemes). However, in <u>Littleton</u>, the Supreme Court explained that a state's "ordinary judicial review procedures suffice so long as the courts remain sensitive to the need to prevent First Amendment harms and administer those procedures accordingly." <u>Id.</u> at 781–82. Here, under the 2022 Ordinance, an applicant may request emergency injunctive relief—a legal mechanism that contemplates prompt judicial review—in the Fourth Judicial Circuit. §§ 150.224(h),

151.214(h); (Doc. 1-1 at 7, 14–15). The licensing scheme therefore provides the necessary procedural safeguards set out in <u>Freedman</u>.[25]

## B. Count III — Constitutionality of Performer License Application Requirement

Plaintiffs object to one application requirement: that performers list "each [dancing or adult] entertainment establishment where the applicant will be performing and each stage name used by the applicant at each location." §§ 150.224(c), 151.214(c); (Doc. 1-1 at 3, 11). Each performer must update this and any other application information within sixty days of any change. §§ 150.224(c), 151.214(c); (Doc. 1-1 at 4, 12). Plaintiffs contend this disclosure requirement is an unlawful prior restraint and not narrowly tailored to advance any legitimate government interest. (Doc. 1 ¶ 115); (Doc. 2 at 18–19). The City argues this requirement serves its interest in preventing human trafficking because it allows "law enforcement to keep track of performers." (Doc. 24 at 8 n.4). Plaintiffs counter that the City already serves this interest by documenting the names and biographical information of all licensed performers

---

[25] To the extent Plaintiffs claim the Ordinance provides too narrow of an appellate remedy, this argument is unpersuasive. Sections 150.224(h) and 151.214(h) do not require applicants to appeal a Sheriff's decision by requesting injunctive relief; rather, applicants "may" request emergency injunctive relief. Therefore, any other applicable remedies under Florida law remain available to applicants; the 2022 Ordinance does not limit the form of judicial review available.

and by requiring every establishment to maintain a current record of all licensed performers. (Doc. 25 at 7–8).

While preventing human trafficking is a substantial government interest, the application requirement must still be narrowly tailored towards that end. The proponent of a prior restraint carries the burden of showing justification for the imposition of such a restraint. Schultz, 228 F.3d at 851 (citing New York Times Co. v. United States, 403 U.S. 713, 714 (1971)). Regulations are narrowly tailored if they "promote[] a substantial government interest that would be achieved less effectively absent the regulation." Ward, 491 U.S. at 799 (quoting Albertini, 472 U.S. at 689). Regulations "may [not] burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." Id. (citations omitted).

Previously, in the 2020 Ordinance, the Court found two application requirements unconstitutional, namely, that applicants provide their fingerprints and proof of citizenship or work eligibility. Wacko's Too, 522 F. Supp. 3d at 1149–51. Neither requirement legitimately related to preventing human trafficking. Id. But, the Court upheld the requirement that adult entertainment establishments maintain rosters as "a permissible way to keep track of licensed performers, secondary to combatting human trafficking." Id.

70

at 1151. The performer disclosure requirement under the 2022 Ordinance also relates to preventing human trafficking by allowing law enforcement to "keep track" of performers, but the City advances no meaningful explanation for how this additional disclosure requirement is necessary to serve that end, particularly when establishments are required to document this same information about the licensees who perform. And it places a substantial burden on a performer by requiring a continual update on the performer's whereabouts in the name of the City being able to "keep track" of the performer.[26] Simply put, the disclosure requirement is duplicative of the roster requirement and thus does not advance the City's interest commensurate with the burden on free speech. See e.g., Schultz, 228 F.3d at 852 (striking license application requirements for "residential address, recent color photograph, Social Security number, fingerprints, tax-identification number[,] and driver's license information" as they were "redundant and unnecessary" for the government's stated purpose and were thus not narrowly tailored to the government's interests in regulating adult entertainment). The City therefore fails to carry its burden in justifying the need for the performer disclosure requirement. Accordingly, the requirement for performers to disclose and continually update

---

[26] The Court is rightfully wary of any government regulation designed to "keep track" of a citizen without sufficient justification.

their performance venues in §§ 150.224(c) and 151.214(c) does not stand. Permanent injunctive relief as to Count III is granted.[27]

## V.    SEVERABILITY

The Court must determine whether the invalid portions of Chapters 150 and 151 are severable from the rest of the Chapters. "Severability is a judicially created doctrine which recognizes a court's obligation to uphold the constitutionality of legislative enactments where it is possible to remove the unconstitutional portions." <u>Florida Dept. of State v. Mangat</u>, 43 So. 3d 642, 649 (Fla. 2010) (citing <u>Ray v. Mortham</u>, 742 So. 2d 1276, 1280 (Fla. 1999)).

Severability is a question of state law. <u>Wollschlaeger v. Governor</u>, 848 F.3d 1293, 1317 (11th Cir. 2017). The "key determination is whether the overall legislative intent is still accomplished without the invalid provisions[;]" courts adhere to the express intent of the legislature regarding severability whenever possible. <u>State v. Catalano</u>, 104 So. 3d 1069, 1080–81 (Fla. 2012); <u>Lawnwood Med. Ctr., Inc. v. Seeger</u>, 990 So. 2d 503, 518 (Fla. 2008).

---

[27] Plaintiffs also claim the disclosure requirement is "unworkable in practice," as it requires new performers have a place of employment as a condition to applying for a Work Identification Card. (Docs. 2 at 6, 25 at 8 n.5). This misconstrues the Ordinance, which does not require that performers be employed before submitting an application. In other words, the 2022 Ordinance does not permit the Sheriff to deny the application if the applicant does not have a current or potential place of employment.

The Court has found several provisions in the 2022 version of Chapters 150 and 151 unlawful. Specifically, the Court has found several portions of §§ 150.224(c) and 151.214(c) entitled "Application for Work Identification Card" unlawful, including the vague age restriction language, the "human trafficking-related" charge application criteria, and the disclosure obligation requiring applicants to list each entertainment establishment where the applicant will be performing. <u>Supra</u>, Sections II.B, IV.A.i, IV.B. As these requirements are part of the application process stated in §§ 150.224(c) and 151.214(c), those requirements cannot be severed from the sections. Therefore, §§ 150.224(c) and 151.214(c) are severed from their respective Chapters in their entirety. This accomplishes the City's legislative intent as provided in the 2022 Ordinance: "The provisions of this Ordinance are intended to be severable, and if any provision is declared invalid or unenforceable by a court of competent jurisdiction, such provision shall be severed and the remainder shall continue in full force and effect with the Ordinance being deemed amended to the least degree legally permissible." (Doc. 1-1 at 5 in 3:22-cv-798).

The Court also struck several penalty provisions. Under Chapter 150, the Court found §§ 150.509, 150.510, and 150.609 vague to the extent they conflict with one another. <u>Supra</u>, Section III.C. The Court also found the proximity provision in § 150.606(h) unlawful to the extent it provides incarceration based on vicarious liability. <u>Supra</u>, Section III.B. The Court also found that the

73

incarceration penalties contained in §§ 150.509(c) and 150.609(b)(2) were unlawful. Supra, Section III.B. Under Chapter 151, the Court declared unlawful the incarceration penalties contained in §§ 151.501(b)(2) and 151.506(c) to the extent they provide incarceration based on vicarious liability. Id. As severing subsections or clauses of subsections would create further confusion about how to read the law, the Court severs §§ 150.509, 150.510, 150.606, 150.609, 151.501, and 151.506 in their entirety from Chapters 150 and 151.

In short, if the City wants to enact an age restriction, a constitutional licensing scheme, and a constitutional penalty regime, it must comprehensively revise the relevant sections of Chapters 150 and 151. This would also bring needed clarity to the Chapters, which have been amended piecemeal over the years.

## VI.   PERMANENT INJUNCTION

A permanent injunction requires Plaintiffs in both cases to show: (1) actual success on the merits of the claims asserted in the Complaint; (2) that irreparable harm will result without injunctive relief; (3) that the balance of equities tips in their favor; and (4) that an injunction serves the public interest. KH Outdoor, LLC v. City of Trussville, 458 F.3d 1261, 1268 (11th Cir. 2006). Except for showing actual success on the merits instead of likelihood of success, the elements for a permanent injunction mirror those for a preliminary injunction. Id.

74

Plaintiffs have succeeded on certain of their challenges to the Jacksonville Municipal Code and the 2022 Ordinance. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976) (citation omitted); see also Deerfield Med. Ctr. v. City of Deerfield Beach, 661 F.2d 328, 338 (5th Cir. 1981) ("It is well settled that the loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction."). Here, portions of the City's Code and 2022 Ordinance infringe on First Amendment expression, and irreparable harm is therefore presumed.

Further, injury to Plaintiffs in both cases outweighs any harm brought upon the City by the issuance of the injunction. The City may regulate adult entertainment establishments, but it must do so in a constitutional manner. When an ordinance violates the First Amendment, enjoining the ordinance also "advance[s] the public's interest in freedom of speech." FF Cosmetics FL, Inc. v. City of Miami Beach, 866 F.3d 1290, 1298 (11th Cir. 2017); see also Pac. Frontier v. Pleasant Grove City, 414 F.3d 1221, 1237 (10th Cir. 2005) ("Vindicating First Amendment freedoms is clearly in the public interest."); Baumann v. City of Cumming, No. 2:07-CV-0095-WCO, 2007 WL 9710767, at *7 (N.D. Ga. Nov. 2, 2007) ("[T]he temporary infringement of First Amendment rights constitutes a serious and substantial injury, and the city has no

legitimate interest in enforcing an unconstitutional ordinance."). Ultimately, the public interest is best served when the courts maintain First Amendment freedoms and decline to enforce unconstitutional ordinances. See Howard v. City of Jacksonville, 109 F. Supp. 2d 1360, 1365 (M.D. Fla. 2000). Plaintiffs have met the requirements for a permanent injunction as to the portions of the Code declared unconstitutional or unlawful herein.

After conducting a non-jury trial on all issues and in accordance with Federal Rule of Civil Procedure 52, it is hereby

**ORDERED:**

1.   As stated herein, for Wacko's I (No. 3:20-cv-303), permanent injunctive relief is **GRANTED in part** and **DENIED in part** as to **Counts IX**, **X**, and **XII**; relief is **DENIED** as to **Counts IV**, **VI**, and **VII**; and relief is **DENIED as moot** as to **Count XXVI** and **XXVII**.

2.   Sections 150.509, 150.510, 150.606(h), 150.609, 151.501(b)(2), and 151.506(c) of the Jacksonville Municipal Code are facially unconstitutional. The City of Jacksonville will be permanently **ENJOINED** from enforcing §§ 150.509, 150.510, 150.606, 150.609, 151.501, and 151.506 of the Jacksonville Municipal Code.

3.   As stated herein, for Wacko's II (No. 3:22-cv-798), permanent injunctive relief is **GRANTED** as to **Count III**; relief is **GRANTED in part**

76

and **DENIED in part** as to **Counts I** and **IV**;[28] relief is **DENIED** as to **Counts II** and **V**.

4.      Sections 150.224(c) and 151.214(c) of Ordinance 2022-172-E of the Jacksonville Municipal Code are facially unconstitutional. The City of Jacksonville will be permanently **ENJOINED** from enforcing §§ 150.224(c) and 151.214(c) of Ordinance 2022-172-E of the Jacksonville Municipal Code.

5.      A Final Judgment and Permanent Injunction capturing these rulings, as well as those made in the Court's earlier Wacko's I Order (Doc. 39), will be entered separately. The Court intends for the Final Judgment and Permanent Injunction to be a comprehensive ruling in both Wacko's I and Wacko's II.

6.      The Clerk shall terminate all pending motions and close both cases.

**DONE AND ORDERED** in Jacksonville, Florida the 27th day of February, 2023.



TIMOTHY J. CORRIGAN
United States District Judge

ksm
Copies:

Counsel of record

---

[28]  Because the Court found the term "human trafficking-related" to be an unlawful prior restraint in Count I, Plaintiffs' vagueness challenge to the term in Count IV is moot. See supra, Section IV.A.i.